THE GEORGE S. SHULTZ.

THE LITTLE SILVER.

CRAMER v. CLANCY et al.

NEW YORK & M. P. S. S. CO. v. SAME.

(Circuit Court of Appeals, Second Circuit. January 7, 1898.)

No. 15.

1. COLLISION RULES—STEAMER WITH TUG AND TOW—NEW YORK HARBOR.
　Rules 19 and 23, providing that when steam vessels meet on crossing courses, so as to involve risk, the one having the other on her starboard side shall keep out of the way, and the other shall hold her course, are applicable in the waters of the North river opposite New York, and are binding on a steamer or tug, though incumbered with a tow on a hawser; and the burdened vessel does not acquire any right of way by signaling first, unless the privileged vessel assents to the signal.

2. SAME.
　If the burdened steamer persists in crossing the bow of the privileged steamer in the face of danger, intending to force the latter to give way, she will be primarily responsible for a resulting catastrophe; and the privileged vessel will not share in such responsibility, unless she persists in her course and speed after it becomes apparent that the burdened vessel has gone so far as to make it impossible to keep out of the way by changing course, stopping, or reversing.

3. SAME—NEGLIGENT LOOKOUT.
　A privileged steamer meeting a tug and tow in the North river held guilty of contributory fault where the tug insisted on crossing her bows in the face of danger, in that, because of a negligent lookout, she did not perceive that the tug had a tow, and therefore continued her course and speed, so as to collide with the tow. 74 Fed. 574, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal by both claimants from a decree of the district court, Southern district of New York, holding both the Shultz and the Little Silver in fault for a collision between the Little Silver and libelants' schooner, Amos Briggs, in tow of the Shultz. 74 Fed. 574. The collision occurred about 11 a. m. on October 21, 1895, in the North river, between the New Jersey Central Ferry, on the Jersey side, and the Battery. The facts sufficiently appear in the opinion.

Charles C. Burlingham, for the Shultz.
Mr. Park, for the Little Silver.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The Shultz, which is a moderate sized tug, about 70 feet long, with the schooner Amos Briggs (about 110

feet long over all) in tow, on a hawser of 25 fathoms, had come down the North river, on the New Jersey side, and, when abreast of Communipaw Ferry, headed across for the East river. The tide was strong flood, and the wind fresh from N. W. The Little Silver is a side-wheel steamer, running from Monmouth Park, N. J., to Little Twelfth street, North river. She was coming up from the lower bay, making about 14 miles an hour, and heading so as to clear pier 11, on the New York side. The Shultz crossed the bows of the Little Silver, but, her engines being reversed, the hawser between herself and her tow was slackened; and the Little Silver, which at no time changed her course, passed across it, between the tug and tow, colliding with the schooner.

That the Shultz was grossly in fault is manifest upon her own evidence and upon that from her tow. They were on crossing courses, and the Shultz had the Little Silver upon her starboard hand at the time when it became necessary for them to navigate according to regulations if they were to avoid risk of collision. This is the testimony of the independent witness from the tug Townsend. There is nothing to contradict it, and it is apparent from their points of departure and respective destinations that such must have been their relative positions. The engineer of the Shultz placed the models to show their positions, "putting the Little Silver a little aft of his beam, and heading for the bow of the Shultz." The master of the Shultz also placed the models indicating that the Little Silver was "nearly seven points on his starboard bow." Counsel for the Shultz contends that the vessels were in the position known as the "seventh situation" of the inspectors' rules. Of course, by the time the Shultz had crossed the bows of the Little Silver sufficiently far to leave the latter heading directly for her and just abeam, the vessels would be in the seventh situation; but the obligation to navigate according to rules arose before that time, and the pilot of the Shultz knew that it had, for it was while they were on crossing courses, with the Little Silver on his starboard hand, that he blew his first signal. He said: "I saw him coming up the bay a good safe distance, and I blew him two whistles."

Counsel further contends that "fault is not chargeable against a vessel for having another on her own starboard hand." That is true enough, but she is in fault if she does not navigate in accordance with the regulations governing the movements of vessels thus placed. Rule 19 of section 4233 of the United States Revised Statutes provides: "If two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." That rule has since its first enactment been in full force in harbors, rivers, and inland waters. The acts of March 3, 1885, and August 19, 1890, did not affect its application in such locality; and the act of February 19, 1895, expressly re-enacted it. Rule 23 of the same section (4233), equally applicable, provides that "where, by rule * * * 19, * * * one of two vessels shall keep out of the way, the other shall keep her course, subject to the qualifications

of rule 24," which provides for special circumstances. It might be supposed that, after all the years which have elapsed since their passage, the application of these two rules would be the very A B C of practical navigation. The burdened vessel is to "keep out of the way." How it shall do so is not prescribed. It may, of course, turn to starboard sufficiently to allow the privileged vessel to pass, and then proceed under the stern of that vessel. This is the path of safety. It may "keep out of the way" by crossing the bows of the privileged vessel, but, in undertaking this maneuver, it is chargeable with the knowledge that the other vessel is by express rule required to keep her course. Unless, then, the burdened vessel has time and space thus to cross in safety without the help of the privileged vessel, prudent navigation would forbid her making such attempt. If she make the attempt, and thereby brings about collision, she is in fault for not keeping out of the way of the privileged vessel. The inspectors' rules give her the opportunity of agreeing with the privileged vessel that this usually risky maneuver shall be attempted, and that the privileged vessel will co-operate to that end. Such agreement would constitute a special circumstance, within the meaning of rule 24. This agreement is effected when the burdened vessel's signal indicating an intention to cross in front of the privileged vessel is accepted by a corresponding signal from the privileged vessel. But the burdened vessel which without such agreement undertakes to navigate as if she had the privilege, and the other the burden, assumes all responsibility for the consequences resulting from such failure to conform to regulations. All this has been explained in the opinions of the courts over and over again. It is sufficient here to refer to the decision of this court in The John King, 1 C. C. A. 319, 49 Fed. 469.

It is a fair inference, however, from the testimony in the different collision records that come before this court, that the practice is not uncommon among masters of steam vessels in these waters to navigate in utter disregard of any burden imposed upon them by rule 19. In some cases it seems to be assumed, wholly without authority, that a tug which has a tow is always privileged, no matter what her position. In other cases it has apparently been supposed that the master who first signaled was privileged to prescribe how the other vessel must navigate, sailing rules to the contrary notwithstanding. This curious theory seems to have been based on a misreading of one of the inspectors' rules. It was exploded in The John King, supra. In other cases it seems to be supposed that some "courtesy" is due to a pilot of long experience, or to the senior of some flotilla belonging to a common owner, by his juniors in service, and that his vessel is always "privileged," no matter where she may be placed relatively to some other vessel. Signaling upon some theory of "courtesy," instead of in conformity to rule, had much to do with the confusion which brought both vessels into trouble in Le Champagne and The Lisbonense, 3 C. C. A. 546, 53 Fed. 293. In other instances the personal equation of the individual master has to be taken into account. It might be surmised

a priori, and experience proves the truth of the surmise, that there will be found no inconsiderable number of masters who will never shoulder any burden of navigation which the rules lay upon them if they can force the privileged vessel to assume it, or at least to share it with them. These are the men who hold on a course which they know to be expressly forbidden by the rules, until the very last moment, hoping thus to coerce the other and privileged vessel to yield the right of way. The dread of injury to his vessel or to himself, his crew or passengers, will no doubt often induce the master of the privileged vessel to yield,—a timidity no doubt augmented by the many decisions which have held privileged vessels in fault for not doing something themselves to avert catastrophe. If, however, the master of the privileged vessel declines to be bluffed out of his right of way, the lawless navigator will usually at the eleventh hour conform his navigation to rule. If there be still time to save the situation, no harm is done. If the offending master has miscalculated, and held on too long, and collision results, he is usually vociferous in support of the proposition (which is no doubt correct) that if the privileged vessel had only stopped or changed her course, and left him free to go where he chose, no catastrophe would have ensued. This class, if it exist,—and we do not doubt it does,—is a standing peril to navigation. Excuse should be difficult for any master who, with full knowledge that he is the one who, under the rules, should change his course or speed or both, begins his navigation in the presence of approaching risk of collision by insisting that the other vessel shall make such changes.

As was said before, it is indisputable upon the evidence that, when the necessity of navigating to avoid risk of collision arose, the Shultz had the Little Silver on her starboard hand. It must be assumed that the master of the Shultz knew that, under the rules, the Little Silver had the right of way, and that it was the duty of the Shultz to keep out of her way; that, although it was left to his judgment as a navigator to decide what movements to make in order to keep out of the way, the movements, whatever they were, were to be undertaken by him as master of the burdened vessel. From the very outset, however, he acted as if his vessel were privileged, and as if the duty of keeping out of the way were laid upon the Little Silver. He testifies:

"I first saw him [the Little Silver] coming up the bay a good safe distance off, and I blew him two whistles. * * * I couldn't tell how far off he was then, in number of feet, but I know it was a good distance to go clear either way he wanted. * * * I blew two whistles, by which I meant that he would go under the stern of the schooner [my tow]. I got no answer, * * * and gave an alarm signal. When I blew the alarm signal, he was a nice safe distance off to go clear if he wanted to. * * * There were not any boats in the way of the Little Silver that I saw. She had the whole river clear to the westward. * * * At the time I gave my two signals [two-whistle signal], the Little Silver would have had to change her course a very little to clear my tow. Q. Did you have that vessel when you first saw her on your starboard hand, do you think? A. Yes. Q. Whose duty was it to keep out of the way? A. The Little Silver, after I was, way by him, I think. Q. And you didn't signal until you went by him? A. I

signaled when I had him well on my starboard. He could go clear of her if he saw her."

The fault of the Shultz is glaring. The decree should be affirmed as to her, with interest, costs, and 10 per cent. damages.

As to the Little Silver the district court held:

"The pilot of the Little Silver did not hear the signals of the Shultz, nor did he notice the schooner in tow of the Shultz, nor slacken his great speed till quite near her. A tow of barges crossed to the westward, between the Little Silver and the Shultz and her tow, a few moments before the collision; and the hawser to the schooner was not perceived until the barge had passed, and the Little Silver was within about 200 feet of the hawser."

The evidence sustains this finding.

The district court further held:

"The Little Silver, though the privileged vessel, is also clearly to blame, because she was so easily manageable, and might without difficulty have avoided the schooner after it was perfectly clear that the Shultz was not going astern of her, and was unable to avoid collision. The evidence shows that the Little Silver could come to a dead stop in advancing about 600 or 700 feet. When at that distance, it was self-evident that the Shultz, with the schooner upon a hawser, could not avoid collision by anything the Shultz could do if the Little Silver kept on. It was the duty, therefore, of the Little Silver, on perceiving that fact, to reverse. Had she done so, the collision would have been avoided. That she did not do this is plainly in consequence of a deficient lookout, in not having perceived the schooner astern of the tug, as she ought to have seen her, long before the west-bound tug intervened. The lack of a proper lookout was thus the real cause of the collision on the Little Silver's part. Each being to blame, both must be held answerable for the libelants' damages, with costs."

The collision was so manifestly brought about by the improper navigation of the Shultz that we would be inclined to excuse the Little Silver for some minor fault if the case could be brought within the rule in The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, and The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477. Had the district judge adopted a rule, suggested by him elsewhere, and held the Little Silver to respond to the extent of one-half the damages only if the Shultz was unable to pay the whole, such a division, although novel, would commend itself strongly, as being most equitable. But the finding of fault is clearly sustained by the proof. The period of uncertainty as to what the burdened vessel meant to do which is referred to in The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, The Northfield, 154 U. S. 629, 14 Sup. Ct. 1184, and The Delaware, 161 U. S. 469, 16 Sup. Ct. 516, had passed. It was plainly manifest to the pilot of the Little Silver that the Shultz had gone so far on her improper course that it was absolutely impossible for her, either by changing course or stopping or reversing, to keep her tow out of the way of the Little Silver. By reversing, however, the latter could avoid collision with the tow. She did not reverse, and the only excuse offered is that she did not know there was a tow; but, if she had had a proper lookout, she would have discovered this fact before the west-bound tow of barges temporarily obscured her view of the Shultz and tow. We feel constrained, therefore, to affirm the decree against the Little Silver, with interest, but without costs. The decree against the Shultz is affirmed, with interest, costs, and 10 per cent. damages.