## THE PAWNEE.

### THE EDGAR F. LUCKENBACH.

#### (District Court, S. D. New York. March 16, 1909.)

COLLISION (§§ 7, 93*)—BETWEEN TUG AND STEAMER—STARBOARD HAND RULE.

A tug bound from Jersey City to Atlantic avenue, Brooklyn, was struck on her port side by a steamer bound to sea from her pier on the Manhattan side of the East River. The vessels were on crossing courses, the tug being the privileged and the steamer the burdened vessel. The steamer sought to excuse herself (1) because she had a right to expect that the tug would turn into the East River, and (2) because she was entitled under inspectors' rule 9 to adopt a two-whistle course and pass ahead. Both contentions rejected, the first because a starboard hand situation existed which was not changed by signals, and the second because the rule was invalid as being repugnant to the starboard hand rule.

[Ed. Note.—For other cases, see Collision, Dec. Dig. §§ 7, 93.*

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

(Syllabus by the Judge.)

Wallace, Butler & Brown and Peter S. Carter (Archibald G. Thacher, Advocate), for the Luckenbach.

Wheeler, Cortis & Haight (Charles S. Haight and John W. Griffin, Advocates), for the Pawnee.

ADAMS, District Judge. The first of the above entitled actions was brought by Edgar F. Luckenbach et al., as owners, etc., of the steamtug Edgar F. Luckenbach against the steamship Pawnee to recover the damages, said to be $50,000, sustained through a collision of those vessels in the waters between Governor's Island and the Battery, on the 28th of January, 1908. The libel alleges that the Luckenbach was proceeding from Port Liberty, in the vicinity of Communipaw, New Jersey, about 7:15 P. M., bound for Atlantic Basin, and when the tug was off the entrance to the channel between the said places, the green light and the masthead light of the Pawnee were about a point and a half off the port bow of the tug and approaching her on a crossing course, about half a mile distant, while the tug was exhibiting her red side light and masthead light to the steamer; that thereupon the tug blew a single blast, to indicate that she would continue as the privileged vessel across the course of the steamer and to aid in the said manœuvre, the wheel of the tug was ported somewhat in order to direct her course further to starboard; that no reply was received and the master of the tug was about to give a second blast when a cross signal of two whistles was given by the Pawnee; that immediately upon receiving this cross signal, the master of the tug gave bells to the engine room to stop and reverse her engines at full speed and at the same time she gave a signal of three

blasts to inform the Pawnee that her engines were reversing; that no further whistles were received by the tug until the collision oc-curred, when the steamer Pawnee blew danger blasts; that in spite of the tug's signals the Pawnee did not slacken her speed or keep out of the way, but kept on, with the result that her stem struck .the port side of the tug about 15 feet from her bow, swinging the bow of the tug around to the westward, causing her to sink in a few min-utes and drown one of the members of her crew; that the collision occurred about 7:30 P. M.; that the night was clear, the tide about high water. and there was a light wind. The libellants further al-lege that the collision was solely caused by faults of the Pawnee and that she, although having the tug on her own starboard side, did not keep out of the way as she should have done by passing under the stern of the tug; in that the Pawnee did not keep out of the way by slacking her speed or stopping and reversing in time to avoid the collision; in that the Pawnee did not answer the tug's signal of one blast but on the contrary crossed said signal by blowing two whistles; in that the Pawnee did not maintain a sufficient lookout; in that the Pawnee starboarded her helm and directed her course to port across the course of the tug before receiving an assent to her said cross signal; in that the Pawnee attempted to cross the course of the tug before obtaining the latter's consent to such manœuvre; in that the Pawnee proceeded at an excessive and dangerous rate of speed; in that the Pawnee did not sufficiently port her helm and pass the tug port to port, and, if necessary, for the safe accomplishment of such manœuvre slow, stop or reverse her engines.

The answer of the Pawnee admits the collision at about the time stated in the libel, denies many of the other allegations and alleges the true facts thereof to have been that about 7:20 P. M. the Pawnee left pier 22 East River bound for sea on a regular voyage to Phila-delphia, having her captain, first officer and a quarter master in the pilot house and a competent lookout stationed forward; that the tide was ebb, the night dark and a light breeze was blowing; that the Pawnee proceeded slowly down the East River and then ported to pass between the Battery and Governor's Island and when in the vicinity of South Ferry and on a course about W. by S., the Pawnee sighted on her starboard bow, a red light which afterwards proved to belong to one of the Brooklyn Annex ferry boats of the Pennsylvania Railroad; that said ferry boat rounded the Battery under a star-board hand wheel, opened up her green light and passed the Pawnee starboard to starboard; that about the time the ferry boat passed, those in charge of the Pawnee sighted a red light and a white mast-head light, which afterwards proved to belong to the tug Edgar F. Luckenbach; that said lights when sighted were on the starboard bow of the Pawnee, and about a half of a mile distant; that the master of the Pawnee believing he had room to cross the tug's bow without involving risk of collision, promptly blew a signal of two whistles to the Luckenbach, to which signal, however, no answer was returned; that not considering it wise to proceed without receiving an answer-ing signal from the tug, the master of the Pawnee stopped and backed

her engines and blew a signal of three whistles to indicate that her engines were going astern; that when sighted from the Pawnee, the Luckenbach was going ahead and she continued to approach with no apparent change of course or speed; that when the vessels were in dangerous proximity, the Luckenbach blew a signal of two whistles, followed by a single faint and short blast, but she continued to come ahead, and her stem had crossed the stem of the Pawnee about twenty feet when the vessels came together; that under her reversed engines, the speed of the Pawnee had been reduced to about two knots an hour, but the force of the blow was sufficient to open a hole in the port side of the Luckenbach as a result of which she shortly sank. It is further alleged that the collision was not due to any fault or lack of precaution on the part of the Pawnee but was wholly due to the fault or negligence on the part of the Luckenbach in that she did not answer or act upon the Pawnee's signal of two whistles; in that she did not indicate her own course to the Pawnee; in that she did not slow, stop or back in time to avoid collision; in that she did not recognize that the Pawnee was bound for sea and navigate accordingly; in that she did not starboard her helm and pass the Pawnee starboard to starboard; in that she did not port her helm after the Pawnee blew her signal of three whistles indicating that she was backing, and in that she had no proper lookout.

The second action was brought by the owner of the Pawnee to recover the damages suffered by her in the collision, said to amount to $6,000. In the pleadings, the statements of fact respecting the proceedings of the two vessels and the allegations of fault are practically the same as the foregoing.

The Luckenbach was a steel tug about 120 feet long and the Pawnee was a coastwise freighter about 265 feet long. The weather was clear. It was high water slack in the North River and the first of the ebb in the East River. There was very little current at the point of collision.

The testimony is quite voluminous and, in effect, sustains the different allegations of each party. Apart from some minor details, the controversy of fact is not great, excepting with respect to signals which will be discussed hereafter. The vessels were proceeding as respectively alleged and collision occurred a little more than half way from the eastern end of the Battery wall toward Castle William and about on a line between those places, by the Pawnee striking the Luckenbach as the latter claims. The Pawnee bound to sea, doubtless expected that the Luckenbach was going into the East River and, acting on that theory, attempted to pass her starboard to starboard, but the Luckenbach was not bound into the East River but going to a point on the Brooklyn shore which rendered a course on her part such as would necessitate a passing port to port.

The tug was apparently the privileged vessel under the starboard hand rule, and can not be considered, in the absence of signals indicating an intention to pass starboard to starboard, as governed by the rule which often applies when vessels are turning a bend and necessarily showing lights and bearings which indicate different courses

from those actually pursued. The Victory & The Plymothian, 168 U. S. 410, 418, 18 Sup. Ct. 149, 42 L. Ed. 519. Here was undoubtedly a starboard hand situation (see The New York Central No. 2 [D. C.] 132 Fed. 167), because while there was a turn, there was ample room for ordinary navigation and no signals indicating another method of navigation were given. The Pawnee sought to establish a two whistle course, but nothing of the kind was contemplated by the tug. On the contrary, her theory was that she was the privileged vessel and entitled to the right of way. Her signals were in conformity with such theory, and while there is some conflict about the time of giving of signals, there is no contention on the part of the Pawnee that the tug agreed to navigate starboard to starboard. In the absence of an agreement to deviate from the ordinary method of passing, the Pawnee seeks to establish such a right on her part by the provisions of Rule 9 of the Board of United States Supervising Inspectors, made February 13, 1907, and approved by the Secretary of Commerce and Labor, February 25, 1907. That rule provides:

"Rule IX. When two steamers are approaching each other at right angles or obliquely, other than when one steamer is overtaking another, so that the steamer having the other on her own starboard hand side may cross the bow of the other without involving risk of collision, the steamer having the other on her own starboard side may cross the bow of the other. If the steamers are within half a mile of each other the steamer having the other on her own starboard side shall give, as a signal of her intention to cross the bow of the other, two short and distinct blasts of her whistle, which, if assented to, the other steamer shall promptly answer by two similar blasts of her whistle, when the steamer having the other on her own starboard bow may cross the bow of the other, in which case the steamer having the other on her own port side shall keep out of the way of the other. If, however, the steamer having the other on her own port side deems it dangerous for the other steamer to cross her bow, she shall sound the danger signal, in which case both steamers shall be stopped, and backed if necessary, until signals for passing with safety are made, answered, and understood."

It will be seen that this rule has a very serious effect upon the provisions of the starboard hand rule which provide:

"Art. 19. When two steam-vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

The accompanying rules are:

"Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed.

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

The starboard hand rule is not to be lightly set aside. In The John King, 49 Fed. 469, 473, 1 C. C. A. 319, 322, having the rule under consideration, the Court of Appeals said:

" * * * The inspectors can not lawfully require the other steamer to assent to a departure from the statute in cases covered by the rules of navigation as enacted by congress, and the inspectors' rules are not to be construed as meaning to do so."

In The George S. Schultz, 84 Fed. 508, 28 C. C. A. 476, the same court said:

"\* \* \* That is true enough, but she is in fault if she does not navigate in accordance with the regulations governing the movements of vessels thus placed. Rule 19 of section 4233 of the United States Revised Statutes (U. S. Comp. St. p. 2898) provides: 'If two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other.' That rule has since its first enactment been in full force in harbors, rivers, and inland waters. The acts of March 3, 1885 (24 Stat. 441, c. 354), and August 19, 1890 (26 Stat. 320, c. 802 [U. S. Comp. St. 1901, p. 2863]), did not affect its application in such locality; and the act of February 19, 1895 (28 Stat. 672, c. 102 [U. S. Comp. St. 1901, p. 2899]), expressly re-enacted it. Rule 23 of the same section (section 4233 [p. 2899]), equally applicable, provides that 'where, by rule \* \* \* 19, \* \* \* one of two vessels shall keep out of the way, the other shall keep her course, subject to the qualifications of rule 24,' which provides for special circumstances. It might be supposed that, after all the years which have elapsed since their passage, the application of these two rules would be the very A B C of practical navigation. The burdened vessel is to 'keep out of the way.' How it shall do so is not prescribed. It may, of course, turn to starboard sufficiently to allow the privileged vessel to pass, and then proceed under the stern of that vessel. This is the path of safety. It may 'keep out of the way' by crossing the bows of the privileged vessel, but, in undertaking this maneuver, it is chargeable with the knowledge that the other vessel is by express rule required to keep her course. Unless, then, the burdened vessel has time and space thus to cross in safety without the help of the privileged vessel, prudent navigation would forbid her making such attempt. If she make the attempt and thereby brings about collision, she is in fault for not keeping out of the way of the privileged vessel. The inspectors' rules give her the opportunity of agreeing with the privileged vessel that this usually risky maneuver shall be attempted, and that the privileged vessel will co-operate to that end. Such agreement would constitute a special circumstance, within the meaning of rule 24. This agreement is effected when the burdened vessel's signal indicating an intention to cross in front of the privileged vessel is accepted by a corresponding signal from the privileged vessel. But the burdened vessel which without such agreement undertakes to navigate as if she had the privilege, and the other the burden, assumes all responsibility for the consequences resulting from such failure to conform to regulations. All this has been explained in the opinions of the courts over and over again. It is sufficient here to refer to the decision of this court in The John King, 1 C. C. A. 319. 49 Fed. 469."

The question was again discussed by the same court in The Cygnus, 142 Fed. 85, 87, 73 C. C. A. 309, 311, where it was said:

"Undoubtedly the unfortunate provision in the inspectors' rules about 'not crossing signals,' which—even before its formal enactment in the amendment of 1890 (where it is restricted to vessels meeting end on)—was generally accepted by pilots as what the board required, has within the experience of this court, been prolific of disaster. It operated to produce a belief among those pilots that by giving the first signal they could relieve themselves of the burden which the rules of navigation imposed upon them. But it is, indeed, surprising to find that, in this harbor, 11 years after the decision in The John King, 49 Fed. 469, 1 C. C. A. 319, and four years after the decision in The George S. Schultz, 84 Fed. 508, 28 C. C. A. 476, an excursion boat, carrying sometimes thousands of people, is intrusted to the command of a man who does not know that the starboard-hand rule requires him to keep out of the way of the privileged vessel (which is itself to keep course and speed), unless both vessels have by timely interchange of signals affected an agreement to undertake to navigate otherwise than as the rule provides. The fault of the Cygnus was gross, and was undoubtedly the cause of the collision."

The supervising inspectors have no power to change in any way the rules made by congress. The provisions of the act of June 7, 1897, authorized the inspectors to establish rules "not inconsistent with the provisions of this act" (Act June 7, 1897, c. 4, art. 31, § 2, 30 Stat. 102 [U. S. Comp. St. 1901, p. 2884]; 2 Supp. Rev. St. U. S. p. 626). The supervising inspectors were transferred to the Department of Commerce and Labor by Act Feb. 14, 1903, 32 Stat. 825, c. 552 (U. S. Comp. St. Supp. 1907, p. 84), but I find nothing that would give them any powers which they did not possess under the act of June 7, 1897, and previous acts.

The Pawnee's brief states in this connection:

"The old starboard-hand rule, which admitted of no exception, was often inconvenient, and at times dangerous. In navigating New York harbor it was not always feasible for a vessel to pass under the stern of another which was on her starboard hand. It was for the manifest purpose of overcoming this precise difficulty that rule 9 was introduced, and by that rule a vessel having another on her starboard hand was given the absolute right to blow a signal of two whistles, indicating her intention to cross the other's bow, under circumstances which, previously, would not have allowed such a signal. The new rule required that the vessel which previously had an absolute privilege must upon receiving such a signal, do one of two things promptly—either assent to the signal and take prompt measures to act in accordance with it, or immediately stop and reverse and blow danger whistles."

Thus while the navigation was actually conducted upon the theory that the tug was bound, and would turn, into the East River, it is necessary to consider what the Pawnee's rights were under rule 9.

It is there provided that the burdened steamer may cross the other's bow if it can be done without risk of collision. There is nothing new in that, because the old rule has been practically construed to permit such a crossing when not attended with risk.

Within a half a mile of each other in nearly all cases there is risk, as in this case, and the rule then provides that if the other agrees, the privileged vessel shall keep out of the way, and if she deems the crossing dangerous, she shall sound the danger signals and both shall stop and back if necessary. Thus a new element is brought into the starboard hand situation at the option of the burdened vessel, entirely changing the method of navigating.

Inspectors' Rule 8 provided:

"Rule VIII. When two steamers are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steamer is overtaking another, the steamer which has the other on her own port side shall hold her course and speed; and the steamer which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steamer, or, if necessary to do so, slacken her speed or stop or reverse. The steamer having the other on her own port bow shall blow one blast of her whistle as a signal of her intention to cross the bow of the other, holding her course and speed, which signal shall be promptly answered by the other steamer by one short blast of her whistle as a signal of her intention to direct her course to starboard so as to cross the stern of the other steamer or otherwise keep clear.

If from any cause whatever the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steamers shall be stopped, and backed if necessary, until signals for passing with safety are made and understood."

This rule outlines the proper method of navigating in the starboard hand situation and any rule which is inconsistent with it, is of doubtful utility and apparently invalid.

The starboard hand rule was recently (April 3, 1906) considered and applied in The John H. Starin (D. C.) 145 Fed. 723, affirmed (May 21, 1908, C. C. A.) 162 Fed. 146. In the affirming opinion, it was said:

"Per Curiam. We concur with the district judge. The Starin was the privileged vessel, and as such was required to maintain her course and speed. She wholly failed to maintain her course. When the vessels sighted each other she was about 50 feet from the Tenth street buoy and a little on the Brooklyn side of mid river, bound down to round the Battery for her berth on the North River. The collision took place about 100 feet off the line of the New York piers, a little below the Houston Street ferry.

The Jamaica was the burdened vessel, and was required to keep out of the way of the Starin, and to avoid crossing ahead of her if the circumstances of the case admitted. Act June 7, 1897, c. 4, arts. 21, 22, 30 Stat. 101 (U. S. Comp. St. 1901, p. 2883). We are at a loss to see what circumstances there were which did not admit of her executing such manœuver. Instead of doing so, she persisted in crossing ahead, although as her own pilot testifies, three successive two blast whistles which she blew, indicating thereby a wish to navigate otherwise than in accord with article 22 (The George S. Schultz, 84 Fed. 510, 28 C. C. A. 476; The New York, 86 Fed. 814, 30 C. C. A. 628), were each responded to with a single-blast whistle, which was a distinct refusal to enter into any agreement to modify the requirements of the article.

We do not agree with her counsel in construing pilot rule 2 as allowing the burdened vessel to abrogate article 22, by blowing a signal which indicates an intention to cross ahead, when the circumstances of the case admit of her crossing behind. The latter part of the rule would seem to indicate that it was framed so as not to be in conflict with the articles, and, if it were, the articles, and not the rules, are of superior authority. The John King, 49 Fed. 469, 1 C. C. A. 319."

Rule 9 had not been promulgated at the time of the collision there involved and the case may be taken as the latest exposition in this district of the law under the old rules.

After careful consideration, and some hesitation, I conclude that rule 9 so far as it is in conflict with the starboard hand rule, as previously construed and applied by the courts, is invalid. The situation involved here is therefore governed by the old rule which made the tug the privileged vessel, and the Pawnee the burdened one. It was the latter's duty to avoid an attempt to cross ahead of the tug and the making of such an attempt was a fault on the Pawnee's part to which the collision was due without doubt.

There was evidence of other faults on the part of the Pawnee but in view of the foregoing determination, it is unnecessary to pursue them.

Many faults, apart from the failure to observe rule 9, have been urged against the tug, to which some attention should be given. There is an irreconcilable conflict in the testimony with respect to the signals. I think the preponderance shows that the tug gave the first signal, a single blast, and that 20 or 30 seconds later, the Pawnee blew a signal of two blasts, upon hearing which the Luckenbach immediately stopped and reversed her engines and blew a signal of three blasts. The engine movements of the tug had the effect of practically stopping

her headway. The Pawnee also stopped and reversed her engines before the collision and about the time, possibly, gave a signal of three blasts, but she did not succeed in stopping her headway as is demonstrated by the wound in the side of the tug. There was a disinterested witness of the collision in the person of a Norwegian ship master, who happened to be on the Battery. This witness had had some practical experience in navigation as quarter master and boatswain in lines out of New York and a little as chief officer and master abroad. He seemed to be intelligent and impartial. He heard the tug blow her one whistle signal and said it sounded well. He heard no answer until about 15 seconds later when he heard a signal of two from the Pawnee. He saw the collision and he thought the steamer was going at the rate of at least 3 or 4 miles, while if the tug was making any headway; it did not exceed a knot. His testimony to some extent corroborates that of those on the tug and has some weight in determining the controversy on the disputed facts. The tug was not required to answer the Pawnee's signal of two blasts with a similar signal. Her navigation was properly based upon the starboard hand rule and she correctly indicated her course thereunder. She stopped and backed as soon as she could reasonably be expected to. She was not required to conform her navigation to that of the Pawnee.

There is some difficulty with respect to the tug's lookout. She had one stationed in the pilot house. That was not a proper place for him but it appears that the absence of one from the deck forward was not a cause of, or contributory to, the collision. The case is similar to The New York Central No. 22 (D. C.) 124 Fed. 750, where a master in the wheel house was held a sufficient lookout as he was performing the duties of one, not being engaged in steering the vessel, in view of the culpable negligence of the other vessel. This was affirmed on appeal. 135 Fed. 1021, 68 C. C. A. 661.

It is also charged against the tug that she was in fault for not carrying a range light. It does not appear how this would have affected the matter. In any event, carrying such a light is optional upon sea going vessels—article 2 (e)—which the tug was.

The collision can be fully accounted for by the attempt of the Pawnee to cross the bow of the tug and if I am correct in holding that rule 9 did not give her any right to make that effort, she should be held for the consequences of the collision.

Decree for Luckenbach et al., with an order of reference. Libel of Clyde Steamship Company dismissed.