### THE PIANKATANK.

### NEW CASTLE TERMINAL CO. et al. v. UNITED FRUIT CO.

#### No. 4084.

Circuit Court of Appeals, Fourth Circuit.

Jan. 9, 1937.

George W. P. Whip, of Baltimore, Md. (Lord & .Whip, of Baltimore, Md., on the brief), for appellants.

C. Marshall Barton, Jr., and Randolph Barton, Jr., both of Baltimore, Md. (Barton, Wilmer, Bramble, Addison & Semans, of Baltimore, Md., and John L. Warren, of Boston, Mass., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and WATKINS, District Judge.

WATKINS, District Judge.

Appellee, owner of the steamship Telde, filed its libel against appellants in consequence of a collision which took place between the steamships Piankatank and Telde on July 18, 1935, at about 5 o'clock, p. m., in broad daylight and under normal conditions of wind, tide, and visibility. The accident occurred in what is known as "the basin," which embraces the extreme western or dead end of the harbor at Baltimore, Md., and begins in the angle formed at the intersection of Light street and Pratt street, east of the former and south of the latter. Previous to the accident, the Piankatank was berthed at Pier 4, extending east from Light street and within a short distance of the intersection of the two streets. The Telde was berthed in its slip just east of Pier 1, extending south from Pratt street. The Piankatank is a twin screw steamer about 200 feet in length and about 900 gross tonnage; the Telde a single screw steamer about 300 feet in length and about 2800 gross tonnage. Both vessels were parked bow in. Shortly .before 5 o'clock, the Telde, preparing to leave the harbor on a voyage to South America, sounded her long slip whistle and began to back out. As her stern came athwart the end of the pier, her officers observed certain barges approaching on the opposite side of the basin and stopped the ship to await their passage. As soon as they completed their movements, the Telde sounded another long slip whistle and immediately proceeded to back out. There is some conflict of testimony as to the exact time when the Piankatank also sounded her long slip whistle and began backing out. Some of the witnesses for the libelant indicated that this did not occur until after the second long slip blast of the Telde, and it was admitted by the captain of the Piankatank that the blasts of the two vessels were practically simultaneous, and that each began backing out, therefore, at practically the same time. He stated that as his long slip whistle ended, he heard that of the Telde and saw her moving back. From this time on, every movement of the Telde was right in line of his vision from his position on the port side of his own backing vessel. In order for the Piankatank, which was embarking on a voyage to the Eastern Shore of Maryland, to proceed out of the harbor, it was necessary for it to pass Pier 1, above mentioned, which was located several hundred feet east and farther down the basin. It was also necessary, proceeding astern as it was, for it either to await the completion of the Telde's maneuver or else to cross the path of the Telde before getting set on its course. Its captain admitted that it was his intention to back his ship clear across the path of the Telde and in front of its bow, and thus bring his ship to rest and permit the Telde to go forward on its own course by crossing the Piankatank's bow.

Judge Coleman, who tried the case, saw the witnesses in person, and by personal questioning elucidated the obscure points in the testimony, decided that the collision was due entirely to the fault of the Piankatank; that the Telde was the favored vessel under the circumstances; and that her movements were normal, obvious, and safe if the vessel astern, the Piankatank, gave reason-

able regard to them. He found that there was a continuing burden upon the Piankatank which had not been meet by the weight of credible evidence, and that there was no burden upon the Telde which had not been met, even giving the most liberal interpretation to the rules that applied to the situation. He did not find that the Piankatank was an overtaking vessel, but stated that it was in a position akin to that of an overtaking vessel, and that it assumed at the start the burden which is imposed upon a less favored vessel in a situation of that kind and thus had to meet all the obligations that go with it.

A principal contention of the appellants is that since the collision took place in a narrow channel as the two vessels were leaving their moorings, the general rules do not apply, and that the case is governed by the special circumstance rule. What occurred after the two vessels began their maneuvers is the subject of some dispute. However, we think that the admitted facts of the case are sufficient to justify the final conclusion reached by Judge Coleman that the Piankatank was solely at fault. There is no dispute that the Telde on leaving its berth pursued an entirely normal course. It promptly backed as far as was safe across the narrow channel—admitted to be only about 900 feet in width at that point, stopped at a safe distance from certain anchored barges, and then immediately started full speed ahead, swinging to starboard as was necessary in order to get set on its course and proceed out of the harbor. The Piankatank, after leaving its mooring, continued to back slowly for a considerable distance and twice sounded two blasts, neither of which was answered by the Telde until just before the accident, when the Telde sounded one short blast to indicate that she was maintaining her course and speed. It is admitted that both vessels had proper lookouts, though the Piankatank was not seen by the captain of the Telde until very shortly before the accident. The captain of the Telde stated that he did not hear the signals of the Piankatank, but the officer who was performing the duties of second mate on the Telde, and who did hear the signals, stated that while he heard both of the two-blast signals of the Piankatank, he did not think there was any danger because he thought the Piankatank would stop until the Telde had left the basin, and that it could have stopped in time after the Telde's one-blast signal was given. It is a significant fact, in this connection, that the captain of the Piankatank, then several hundred feet away, observed the Telde as she ceased her movement astern and started full speed ahead. He testified that he "could tell from the way his propeller threw the water he went ahead at full speed with his helm hard aport. Of course, that threw his bow right to the right and his stern to the left. As soon as I saw that, I jumped into the pilot house and I gave the signal to stop the starboard engine and go ahead on both engines at full speed, rang the jingle. I grabbed the helm and started to change it, but could not change it in that time, I did not have room, my bow was about fifty feet from Pier 1. I felt just a slight brush. I looked out the door and he had passed me." There is no dispute of the fact that the Telde had gone forward at least 200 or 300 feet before the collision took place. The testimony also shows that the Piankatank, at the speed at which she was going, could be stopped within 50 feet. This being true, it is difficult to understand why the collision took place, unless the captain of the Piankatank deliberately continued his movement astern in the face of inevitable danger. The testimony indicates that the accident occurred near the middle of the basin, probably slightly nearer the Pratt street side. At that time the two vessels were approaching each other at practically right angles, and the Telde had so nearly gotten past the course of the Piankatank that she was struck amidships by the stern of the Piankatank. It must be remembered that the admitted purpose of the Piankatank while going astern was to cross the bow and not the stern of the Telde. And it is apparent that the special circumstances surrounding the two vessels indicated not only that to do so was a violation of the rules, but was fraught with the greatest danger.

██ While it is true that the appellate court in cases of this character is entitled to pass upon the facts, it is also true that the determination of the trial judge upon issues of fact is entitled to great weight, and ordinarily should be followed by the higher court unless it is manifestly against the weight of the evidence, or has no evidence to support it. And this is particularly true where the court below hears the evidence orally and not by deposition, with the opportunity of judging the veracity of the witnesses by their demeanor on the stand. The authorities are so numerous and so harmonious upon this question as to render any citations unnecessary.

The special circumstance rules upon which appellants rely are set out in articles 27 and 29 of the Inland Rules (33 U.S.C.A. §§ 212, 221) as follows:

Article 27. "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

Article 29. "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

It is in reliance upon these articles that the appellants maintain that the Telde was neither the privileged vessel nor free from fault. In the case of The Servia, 149 U. S. 144, 13 S.Ct. 817, 822, 37 L.Ed. 681, decided on April 24, 1893, the court held: "The statutory steering and sailing rules before referred to have little application to a vessel backing out of a slip before taking her course, but the case is rather one of 'special circumstances,' under rule or article 24 [present Article 27], requiring each vessel to watch, and be guided by, the movements of the other." In that case, however, the vessel, which would otherwise have been the privileged vessel, precipitated the collision because of inexcusable delay in observing her own practice which she had indicated that she had intended to follow. In other words, the decision in that case was bottomed upon the special circumstances arising out of the fault of a vessel which lost her privileged character by her own misleading negligence in failing to follow a well-known and relied on custom. Four years after this decision was rendered, in rule 5 of article 18, 33 U.S.C.A. § 203, rule 5, Congress provided: "When steam vessels are moved from their docks or berths, and other boats are liable to pass from any direction toward them, they shall give the same signal as in the case of vessels meeting at a bend, but *immediately after clearing the berths so as to be fully in sight* they shall be governed by the steering and sailing rules."

The Pilot Rules, adopted under authority of the Acts of Congress approved June 7, 1897 (33 Stat. 96, 30 U.S.C.A. § 154 et seq.), February 14, 1903 (32 Stat. 825), and March 4, 1913 (37 Stat. 736), for the regulation of navigation in harbors, rivers, and inland waters of the United States, have the force of law and must be here taken into consideration. Among other things, these provide as follows:

Rule VII. "When two steam vessels are *approaching each other at right angles or obliquely so as to involve risk of collision,* other than when one steam vessel is overtaking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse. * * *."

Rule IX. "Every steam vessel which is directed by these rules to *keep out of the way* of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

Since the two vessels just prior to the collision were approaching each other obliquely or on crossing courses, article 19, 33 U.S.C.A. § 204, applies: "When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

While it is true that the Piankatank was going astern while the Telde was proceeding forward at the time of the accident, the Piankatank's position for the purposes of the rules must be considered as if she had been proceeding bow first. Knight's Modern Seamanship (9th Ed.) p. 457. To interpret rule VII otherwise would render it senseless, or its operation utterly perilous, since it would permit a vessel proceeding astern to hold its course and speed just as in case of a vessel going forward, with the inevitable result of a collision. We think it clear, therefore, that the trial judge was correct in holding that the Telde was the privileged vessel, and that the rules quoted and other regulations indicate clearly that it was the intention of Congress that no such broad interpretation of the special circumstance rule should be recognized as is contended for by appellants in this case. A departure from the rules under the articles invoked is only permitted where it is necessary in order to avoid immediate danger, and then only to the extent required to accomplish that object. Laboyteaux, The Rules of the Road at Sea, p.

172; Yang-Tsze Ins. Ass'n v. Furness, Withy & Co. (C.C.A.2) 215 F. 859; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L. Ed. 943; Marsden's Collisions at Sea (9th Ed.) by A. D. Gibb, p. 416. And the burden of proof is on the offending vessel to show not merely that the breach might not have been one of the causes of the collision, or that it probably was not, but that it could not have been. Belden v. Chase, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218; Laboyteaux, supra, p. 6.

In considering the duties of the Piankatank under the rules cited, it must be borne in mind that it was imperatively required to observe both the pilot rules and statutes for inland navigation in the absence of an imperative urge because of special circumstances. When the Telde discovered the dangerous nearness of the Piankatank's approach, if it had checked its speed, or had altered its course and reversed its engine, it would have rendered the collision inevitable, as is clearly shown by the testimony of Captain Laverty. It had a right to assume all along that the Piankatank would not attempt to cross its bow, but would check its own course and speed and either pass astern the Telde, or await the completion of its maneuver before crossing its path. It would have been negligent on the part of the Telde's master to have done otherwise than he did. The Telde pursued the only course permitted to a privileged vessel. Article 23 of the Inland Rules, 33 U.S.C.A. § 208, provides: "Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

The Telde was not only entitled to assume that this would be done by the Piankatank, but was under compulsion of so assuming until it became apparent from her maneuvers that the Piankatank was violating, or intending to violate this rule. Where two courses are open to a vessel, and particularly to the privileged vessel, one to follow the prescribed rules and the other to depart from them, the duty is imperative to observe the rules, and to assume that an approaching vessel will do likewise, until after the danger has become so manifest as to show that there is no proper choice of judgment other than that of departing from the rules. Any other course would lead to confusion and be a most prolific source of accidents. Indeed the rule is so imperative that it does not give a navigating officer any general latitude as to obeying the rules, and permits a departure only when necessary to avoid immediate, and not remote or problematical, danger, and then only to the extent required to accomplish that object. Laboyteaux, supra, p. 172. Furthermore, a departure from the rules would place upon the privileged vessel the burden of proving that in doing so it came within the protection of the article. It is the contention of the Piankatank, however, that the Telde was not only at fault for failure to observe the other vessel's movements and thus diagnose what her intentions were, but also that, because of the signals given, the Telde was at fault in not responding more promptly to the two-blast signals, and also, as the danger appeared more imminent, in not sounding a danger signal. Unquestionably the one short blast signal of the Telde signified her intention to hold her course and speed. Pilot Rules, p. 17. Just what the two-blast signal of the Piankatank meant does not seem to have been clearly understood by the officers of the two vessels. The Pilot Rules, p. 18, provide that two short blasts of the whistle signify intention to direct course to own port, and that three short blasts of the whistle shall mean, "My engines are going at full speed astern." The Piankatank insists that her two-blast signal meant that she intended to cross the Telde's bow. It is unnecessary for the purposes of this case, however, to decide whether this interpretation is correct, and we do not so decide. The Telde was the privileged vessel, and the other could not cross her bow until a signal for that privilege had been given and assented to. When, therefore, the Piankatank attempted to cross without this assent, she assumed all responsibility of the consequences resulting from her failure to conform to the regulations. Laboyteaux, supra, p. 210; The George S. Schultz (C. C.A.2) 84 F. 508; The Scranton (C.C.A. 2) 221 F. 609.

From the foregoing it is clear that the court can reach no other conclusion than that the judgment of the lower court must be affirmed.

Affirmed.