**14**

TANK BARGE 11, Inc., a corporation, and
    United Towing Co., a corporation,
            Libelants,

               v.

THE British Motorship DE BRETT, her
    engines, tackle and appurtenances, Lam-
    port & Holt Line, Ltd., a corporation,
    Doe Company and Richard Roe, Re-
    spondents.

LAMPORT & HOLT LINE, Ltd., a corpo-
    ration, in its own behalf as owner of
    the M. S. De Brett and as bailee of cargo
    laden thereon, Libelant,

               v.

THE Tug VIGILANT, her engines, tackle
    and appurtenances, Bay Cities Trans-
    portation Company, a corporation, Tank
    Barge 11, Inc., a corporation, and United
    Towing Co., a corporation, Respondents.

Nos. 26867, 26931.

United States District Court
N. D. California, S. D.

May 4, 1955.

James A. Quinby, Derby, Cook, Quinby & Tweedt, San Francisco, Cal., for Tank Barge 11, Inc., and others.

Edward D. Ransom, Willard G. Gilson, Lillick, Geary, Olson, Adams & Charles, San Francisco, Cal., for Lamport & Holt Line, Ltd., and others.

HAMLIN, District Judge.

At about 1 a. m. on the morning of April 30, 1954, the tug Vigilant, towing Tank Barge 11, was proceeding downstream (south) on the San Joaquin River, approaching a bend in the river to its left near Twitchell Island Light (which was on its right), and the motorship DeBrett was going up stream north toward Stockton, having passed Buoy 18.

A collision occurred between the De-Brett and the barge about 1500 feet south of Twitchell Island Light, at which time the bow of the DeBrett struck the port side of the tank barge on an angle variously estimated from about 10° to about 40°. It was a clear, dark night with a small flood tide of about one and one-half knots and a west or northwest wind of approximately 30 to 40 miles an hour. As a result of the collision the tank barge exploded, causing extensive damage to it and to the DeBrett. Some days after the collision, a diver located on the bottom of the river a portion of the port side of the barge which weighed about four to five tons and which had been blown off by the explosion. This wreckage was on a line between Twitchell Island Light and Buoy 18, and about 1500 feet south of Twitchell Island Light.

The owner of Tank Barge 11 filed a libel against the DeBrett and the De-Brett filed a libel against the owner of the Vigilant, and the causes were consolidated for trial.

The DeBrett was an ocean-going vessel, 456 feet long, with a beam of 62 feet, powered by a diesel engine of 5400 horse power, and with a single screw, drawing about 17 feet at the bow. The Vigilant was a 64-foot tug, twin screw, with a 20-foot beam, drawing about 7 feet aft, and was towing an empty gasoline barge which was 195 feet long and 40 feet wide, on a towline of about 70 feet.

The evidence established that the operator of each ship saw the other ship when they were about two miles apart. Between the two ships when they first sighted each other was a bend in the river which was to the right as viewed by the DeBrett and to the left as viewed by the Vigilant. The channel was dredged to 30 feet with shallow water on the west side south of the bend, and with shallow water on the east side in the bend of the river. The deep channel on the reach of the river south of the bend was at least 800 to 900 feet wide. In the bend, however, the channel narrowed to about 525 feet. At the point of the collision, the deep channel was at least 900 feet wide.

Articles 18, 25, 27 and 29 of the Inland Rules of Navigation provide respectively as follows:

*Article 18, Rule 1,* 33 U.S.C.A. § 203, "When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other."

*Article 25,* 33 U.S.C.A. § 210, "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

*Article 27,* 33 U.S.C.A. § 212, "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and

to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

Article 29, 33 U.S.C.A. § 221, "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

It is not disputed that the portion of the river in question is a "narrow channel."

Title 33 of the Code of Federal Regulations § 207.640(1) entitled "San Joaquin River Deep Water Channel between Suisun Bay and the easterly end of the Channel at Stockton; use, administration and navigation" in part provides as follows:

"(ii) Light-draft vessels when meeting or being overtaken by ocean-going vessels, shall give right-of-way to such vessels by making use of the shallower portions of the waterway."

"(iii) Rafts and tows must promptly give the channel side demanded upon proper signal by a vessel, and must be handled in such a manner as not to obstruct or interfere with the free use of the waterway by other craft."

The Vigilant was operated by one man, a licensed operator,—the master and other member of her crew being off duty and asleep. The DeBrett was in charge of a licensed pilot and on the bridge with him was a second officer and a helmsman. The Vigilant was proceeding upon the right side of the channel at about seven miles an hour, and when it was approximately at Kentucky Landing, a little less than a mile above Twitchell Island Light, its operator saw the DeBrett which was then about two miles away. When the Vigilant was almost to Twitchell Island Light, its operator testified that he blew one blast of his whistle "to show him that I would pass him port to port." The pilot and those on the bridge of the DeBrett testified that they did not hear such a whistle.

The DeBrett admittedly did not give any whistle signals, but witnesses testified that two flashes of an Aldis lamp were shown for the purpose of indicating that the DeBrett desired a starboard-to-starboard passage. The operator of the Vigilant testified that he did not see such a signal, and that if he had he would not have known what it meant. The operator of the Vigilant testified that he continued on his starboard side of the river making the left turn, and after he had done so, set a course between the Twitchell Island Light on his stern and Buoy 18. He testified that as he continued on this course, the red port light of the DeBrett was visible to him, and that it appeared to him that a port-to-port passing would be made. After the vessels got closer, the range lights of the DeBrett narrowed, and he further testified that he then saw the green light of the DeBrett, which indicated to him that a collision was likely. He continued on his course for approximately a minute and one-half, and then one minute before the collision pulled to the right and then to the left in an endeavor to "whip" his barge around to avoid the collision.

The DeBrett pilot saw the tug and tow when it was in the bend above Twitchell Island Light and when the tug and the DeBrett were almost two miles apart. From the lights displayed he knew a tug and tow were approaching. The pilot then ordered the two flashes of the Aldis lamp given and set his course from a point on the east side of the river toward Twitchell Island Light on the west side of the river, intending to make a starboard-to-starboard passing. He testified that his course was the customary course for large vessels to take and was the only safe and practicable course for him to take, because the shal-

lower water on the east side of the river in the bend made it necessary to be on the left or west side of the river in order to make the turn.

The pilot contended that the Vigilant was operated so as to get on a parallel course with the DeBrett to its starboard, and that he saw the tug two points off his starboard bow at about 150 to 200 feet to his starboard, and that each vessel was showing its green light to the other. The pilot further testified that prior to the collision when he thought the passing was going to be close, he put the DeBrett rudder hard left, not as an emergency measure, but to "correct her" if "she was setting a little bit." The pilot then contended that the tug turned sharply to its right, crossed the bow of the DeBrett and pulled the barge directly in front of the DeBrett, and the collision occurred. He testified that if the tug had not cut to the right, there would have been no collision. At no time did the DeBrett answer the whistle of the Vigilant or give any emergency signal; neither did the Vigilant answer the flashes said to have been given by the DeBrett, or give any emergency signals.

■ Consideration will first be given as to whether the DeBrett was guilty of any fault.

The DeBrett did not give a whistle signal of any kind at any time. This is in violation of the Inland Rules, 33 U.S.C.A. § 203. The reasons given by the pilot therefor, that he did not think the whistle was loud enough or that he did not think the Vigilant would hear it or that he frequently used light signals, constitutes no excuse for such failure.

After giving the two flashes, which he contends he did as a signal, he did not secure any signal or acknowledgment from the Vigilant to make a starboard-to-starboard passing.

When he saw the Vigilant in the bend of the river approximately two miles away, he testified that he knew then that he should have reduced his speed in an endeavor not to arrive in or near the bend until it was clear. While the pilot testified that he did reduce his speed to dead slow for a short period and then changed it to half-ahead until immediately before the collision, the bell book in the engine room in which was recorded the various orders received from the bridge shows that for a period of thirty minutes before the collision the speed of the DeBrett was half-ahead and that it was only reduced to dead slow half a minute before the collision.

The pilot also testified that from the time he changed course about three-quarters of a mile south of the point of collision and set his course at that time upon Twitchell Island Light, that the course of the DeBrett was for all practical purposes straight, up to the collision. If the DeBrett had slowed down as the pilot knew such a vessel should have done under the circumstances, the Vigilant would have reached a point sufficiently south of the bend so that the channel would have permitted a safe passing either to port or starboard of the DeBrett.

When the pilot of the DeBrett saw the Vigilant "fine" on his starboard bow three-quarters of a mile away, the Vigilant at that time being about fifty yards off the Twitchell Island Light and on its right hand side of the river, he testified that even though he then felt that a starboard-to-starboard passing was proper, contrary to the provisions of Article 18 of the Inland Rules of Navigation, he gave no signal as to the DeBrett's intention to make such a passing and secured no agreement of any kind from the Vigilant to accomplish such a passing.

It would appear that the faults of the DeBrett were clear and that such faults contributed directly to cause the collision.

It is further necessary to consider whether the conduct of the Vigilant on the night of the collision constituted a fault on its part.

■ According to the testimony of Blevins, the operator of the Vigilant, he realized when the ships were some 1600 or 1700 feet apart and at a time approximately two and one-half minutes prior to the collision, that the DeBrett was heading for him and that there was going to be a collision. His evidence shows that for one and one-half minutes thereafter he did nothing to change the speed of the tug and tow, did nothing to change its course, and gave no signals of any kind, either danger or otherwise. One minute before the collision, he attempted to speed up and change the course of the tug and tow, but it was then too late.

Assuming that the Vigilant gave a one-whistle signal near Twitchell Island Light for a port-to-port passing (although all the witnesses on the bridge of the DeBrett testified they did not hear it, and although the master and other crew member of the tug and the barge man in the barge said they were asleep and did not hear it), no signal of agreement was received by the Vigilant and the Vigilant continued upon its way without attempting by another whistle signal to get an answer or an agreement. This is true even though the Vigilant's operator testified that he knew that the DeBrett "would come toward Twitchell Island Light" and that he figured the DeBrett "would come over on my side." The conduct of the Vigilant's operator in regard to each of these matters was a fault and such fault contributed to the happening of the accident.

It is also contended by the DeBrett that the Vigilant was at fault for failure to have a lookout in addition to Blevins, the operator, 33 U.S.C.A. § 221.

■■ Blevins contended that he at all times saw the movements of the De-Brett, but admittedly he did not see the two flashes of the Aldis lamp which three witnesses on the DeBrett testified were given. Whether these would have been seen by the lookout and properly reported to and interpreted by Blevins is problematical, but under the rule of The Pennsylvania, 19 Wall 125, 22 L. Ed. 148, which has been adopted in this circuit, (The Silver Palm, 9 Cir., 1937, 94 F.2d 754, certiorari denied, United States v. Silver Line, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1539; Carr v. Hermosa Amusement Corporation, 9 Cir., 1943, 137 F.2d 983; Matson Navigation Company v. Pope & Talbot, Inc., 9 Cir., 1945, 149 F.2d 295; Kaseroff v. Petersen, 9 Cir., 1943, 136 F.2d 184), the burden rested on the Vigilant to show that her violation *could not have been* a cause of the accident. This burden was not borne by the Vigilant.

It would seem that the navigator on each ship determined that he had the right-of-way, and from a position on the river two miles apart, each in sight of the other at all times, stubbornly continued on their courses without securing an agreement as to passing from the other, until a collision was inevitable. The angle at which the DeBrett came in contact with the barge (a somewhat glancing blow) would indicate that if either navigator had followed the rules in reference to whistle signals and had then used proper navigational judgment, a slight change of position of either ship would have avoided the collision.

Counsel on each side contended vigorously as to whether a port-to-port passing or a starboard-to-starboard passing was required under the circumstances.

There was a conflict of testimony as to what was a safe and practicable course for the DeBrett to take, each side having produced experts. The Vigilant contened that a port-to-port passing was proper under Articles 18 and 25 (supra) while the DeBrett contended that a starboard-to-starboard passing was the proper one under the Code of Federal Regulations (supra). The determination of which of these rules controlled over the other is not necessary to this decision. The DeBrett gave no proper signal of its intended starboard-to-starboard passing. If, however, the De-Brett had slowed down enough to allow the tug and tow to have proceeded sufficiently south of the bend in the river before a passing was attempted, either a port-to-port passing or a starboard-to-starboard passing might have been made,

and the DeBrett could have taken a course that would have permitted it to have made the bend at Twitchell Island Light in safety.

The operator of the Vigilant testified that frequently large ships do not answer signals from tugs, and the pilot of the DeBrett likewise said that tugs do not answer signals from other ships. If this is true, it is high time that such practice is changed and that the law as to whistle signals be followed by all vessels in the river. The present case is a glaring example of what can result when the existing rules are not followed.

It appears that the collision was the mutual fault of both the DeBrett and the Vigilant, and that damages should be apportioned accordingly in accordance with the findings herein. By stipulation of the parties, the amount of such damages are to be determined by the parties, or, in the absence of such determination, by the Court.

Findings of fact to be prepared by counsel for DeBrett.