## THE HAIDA.

(District Court, S. D. New York. Oct. 16, 1911.)

1. COLLISION (§ 123*)—SUIT FOR DAMAGES—BURDEN OF PROOF.
   When the burdened vessel, whose duty it was to keep out of the way of another, was grossly at fault in bringing about a collision, she has the burden of showing clearly that the other is chargeable with contributory fault.
   [Ed. Note.—For other cases, see Collision, Dec. Dig. § 123.*]

2. COLLISION (§ 39*)—STEAM VESSELS CROSSING—FAULT.
   Where a collision between two yachts on crossing courses was clearly brought about by the fault of the burdened vessel which, having the other on her starboard side, was bound to keep out of the way, the privileged vessel held not chargeable with fault because she kept her course and speed as required by the rules; it appearing that, until it was too late to avoid the collision, she could not with any certainty know that the other vessel would not change her course, as she might have done and as it was her duty to do.
   [Ed. Note.—For other cases, see Collision, Dec. Dig. § 39.*]

3. COLLISION (§ 38*)—STEAM VESSEL CROSSING—CONSTRUCTION OF RULES.
   Inland Navigation Rules of 1897, arts. 19, 21 (30 Stat. 96 [U. S. Comp. St. 1901, p. 2883]), which give to that one of two crossing steam vessels having the other on her port side the privilege and require her to keep her course and speed, do not admit of the imposition upon that privilege by the pilot rules of the condition that she must signal her intention to so keep her course and speed.
   [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 37, 38; Dec. Dig. § 38.*]

In Admiralty. Proceeding by the owners of the auxiliary yacht Haida for limitation of liability for a collision with the yacht Natalie,

---

and libel by the owners of the Natalie to recover for such collision. Decree dismissing libel.

Convers & Kirlin, for petitioner.
Blodgett, Jones & Burnham, for the Natalie.

HAND, District Judge. This is a proceeding to limit the liability of the auxiliary yacht Haida for a collision occurring on the 14th day of August, 1908, between her and the yacht Natalie about 500 feet west of the entrance, or gap, of the Erie Basin in the harbor of New York. The Haida was holding a northerly course about one point to the east of the south end of Governor's Island, making for the south end of Buttermilk channel, at a speed of about eight miles an hour. The Natalie had left the New Jersey shore, north of Governor's Island, had rounded the south end of Governor's Island, and was making for the entrance of the Basin. As a result of the collision the Natalie was nearly cut in two, slightly aft of amidships, and the master was also injured. Both master and ship have now libeled the Haida. Upon turning the south end of Governor's Island, the Natalie had the Haida upon the starboard hand, and became the burdened vessel. The testimony of the master as to the Haida's course is most improbable, and is contradicted by all other witnesses so that I cannot accept it. Therefore the Natalie, which did not yield at all, was certainly at fault, and the only question is whether or not the Haida is likewise at fault. The Natalie so urges on two grounds: First, because the Haida should have seen the Natalie after it appeared that the Natalie was going to continue and could not change her course; and, secondly, because the Haida did not blow one short blast under rule 8 of the pilot rules to indicate that she would hold her course and speed.

[1, 2] Upon the first contention the facts are these: There were three men on the deck of the Haida, the deck hand, helmsman, and master. The deck hand who was a lookout only saw the Natalie a short time before she was struck, and after the collision was inevitable. At that time he shouted to the master and ran aft. The master gave the stopping signal, and helped the helmsman put her helm hard-a-port, throwing her bow over to starboard. The helmsman had first seen the Natalie rounding Governor's Island with ample space to maneuver. He saw her a second time, after she had changed to a crossing course, and when she must change again to avoid collision, and a third time just before the accident. He failed to advise the master at any time, because he thought the master saw the Natalie. The master saw her when she was off the point of Governor's Island on a course not crossing, and did not look at her again until the deck hand shouted to him. This inattention of the crew is probably explained by the presence of a steam lighter which had blown an emerging blast, and was coming out of the Erie Basin. The Haida, having her on her starboard, was the burdened vessel and owed her a duty of vigilance. However, I think it must be conceded that the Haida kept an insufficient lookout on her port hand, considering the character of the harbor and the

probable presence of light swift craft of just this kind in the neighborhood. Nevertheless it does not follow that the Haida would, or ought to, have changed her course, had she kept a proper lookout. Her duty was to hold her course and speed, and to assume that the burdened vessel would do her duty. If she had, by a nice speculation, changed that course and speed and an accident had resulted, she would have been at fault. The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660. The Natalie insists that, before the Haida acted, there was a period in which it was apparent that nothing which the Natalie would do would avert a collision, and yet within which the Haida could have done so. It is for inaction during this period that the Natalie charges her with negligence. Upon that issue the Natalie has the burden, which she does not discharge. It must always be a close question when that time comes at which the burdened vessel can by no possibility do her duty, and the time is doubly hard for the privileged vessel to find, for she has no right to change her course and speed until then. When the burdened vessel is so grossly at fault as here, the law puts on her the duty of showing clearly that the other was at fault. The Victory and Plymothian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519.

Now the Natalie was a very swift vessel, which could turn in short compass, and she was moving faster than the Haida. I cannot say that there was any period within which a lookout, if he had been looking, must have seen that the accident was inevitable; at least, I cannot say, as I must, if the Haida is to be held at fault, that prompt action by her would have avoided the accident. Perhaps it might, perhaps it might not; but any conclusion must be at best a guess, and a guess will not serve. Andersen, for example, says that he knew that one or the other boat must change her course. He had another thought, which was that the Natalie might "come in and swing up the channel the same way we did." That expresses very fairly the embarrassment in which the burdened vessel puts the other at such a time. This is doubly the case here, where the privileged vessel is herself burdened in respect to another. The lighter had the right of way as against the Haida, which could not under the circumstances be expected to give the same attention as otherwise to the vagaries of other boats to which she owed no duty except after their own default. I can find nothing else in Andersen's cross-examination than that he observed that there would be a collision if the Natalie held her course. That is not enough. It must appear that a collision was inevitable, even if she did, for, while she had a locus pœnitentiæ, the Haida was bound to assume she would use it.

[3] Upon the second point the libelant insists that the failure of the Haida to indicate by a single short blast that she would hold her course was a violation of rule 8 of the pilot rules, and that this violation put upon the Haida the burden of proof of showing beyond fair doubt that her default did not contribute to the accident. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148. Upon the facts it is impossible in my judgment to determine what would have been the effect of the blast in question, because I cannot learn whether the Natalie's course

was determined by the master's inattention, or by his mistaken judgment of the relative speeds of the vessels. Disregarding his own story, as I must do, I can only speculate as to what he was doing. Therefore, if the Haida must show that her failure to signal did not contribute to the accident, she will fail.

The claimant cites The Montauk, 180 Fed. 697, 103 C. C. A. 663, to prove that the requirement of rule 8, that the privileged vessel must signal, conflicts with the statute. The libelant insists that at most the language of that case is obiter. In that case the Montauk was the burdened vessel, and at that time the rules required her to make the first signal. This she did by blowing two blasts, three times, thereby indicating, under the then rule 2, her intention of changing her course to port. The privileged vessel did not answer this signal, and, instead of keeping her course and speed, put her own helm to starboard. The court held the privileged vessel free from blame, because her only fault had been to change her course and speed, and that had been in extremis. Under the facts of the case, however, the privileged vessel was not at fault under either pilot rule 2 or 3 as it then stood, for, as the Circuit Court of Appeals construed rule 3, the only duty of a vessel under that rule, when it thinks the signal injudicious, is to slow down to bare steerageway, and the alarm signal is reserved alone for the case of a misunderstanding. It is therefore true that the remarks in question were not absolutely necessary to the decision of the case so far as concerns the requirement of giving a signal. Still I do not feel that for me the question can remain open until that court chooses to reconsider it. The court says on page 699 of 180 Fed., on page 665 of 103 C. C. A., that two of the requirements of rules 2 and 3 "clearly conflict with Inland Rules 1897, art. 18; rule 1 of which requires the privileged vessel to keep her course and speed." Now, there is no doubt as to which of the two is meant, for the provision for the alarm signal in case of doubt is contained in article 18, rule 3, and the pilot rule is only a restatement of it. Therefore the intention is clear to hold that the statute (article 19), which gives the 'privilege to the vessel having the other on her port hand, and (article 21) which requires her to keep her course and speed, do not admit of the imposition upon that privilege by the pilot rules of a condition that she answer a signal. A fortiori, it would not admit the imposition of the condition that she take the initiative of giving a single blast to indicate her intent to hold her course and speed, which is the form of the present pilot rules.

None of the cases cited appear to be in contradiction of this authority. In The Transfer No. 9, 170 Fed. 944, 96 C. C. A. 154, the sole question was whether, when the vessels had exchanged signals in agreement, they were bound to keep to the agreement. A decision upon that question has nothing to do with whether the privileged vessel was bound to make a signal in order to hold her course and speed. All that could be questioned was whether she meant to waive her privilege and so consented.

It is noteworthy that rules 2 and 3 as proposed by the report of September 15, 1911, of the committee to the maritime law association,

make the giving of a blast only permissive. That is to say, they fix a meaning to the blast, but do not try to annex a condition to the privilege given by the inland rules.

The libel is dismissed, with costs.