## MATSON NAV. CO. v. POPE & TALBOT, Inc.

### No. 10606.

Circuit Court of Appeals, Ninth Circuit.

May 11, 1945.

As Modified May 19, 1945.

Rehearing Denied June 15, 1945.

Brobeck, Phleger & Harrison and Lyman Henry, all of San Francisco, Cal., for appellant.

Lillick, Geary, Olson & Charles, Ira S. Lillick, and Allan E. Charles, all of San Francisco, Cal. (Kent A. Sawyer, of San Francisco, Cal., of counsel), for appellee.

Before GARRECHT, MATHEWS, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

A libel to recover damages arising out of a collision between the SS Maui and the SS Absaroka on San Francisco Bay was filed by the Matson Navigation Company, owner of the Maui, against the Absaroka and her owner, Pope & Talbot, Inc. The latter corporation in turn filed a libel against the Maui and the Matson Company. Answers and cross-libels were filed by both corporations. The suits were consolidated for all further proceedings, including trial. The district court adjudged the collision and resulting losses solely the fault of the Maui, decreed the recovery of damages by Pope & Talbot, Inc., and ordered a reference for proof of the Absaroka's damages. The Matson Company appeals from the decision.

The Maui and the Absaroka were both steam cargo vessels. During the early morning of November 2, 1941, the former was proceeding from Crockett in a southerly direction parallel to Treasure Island toward Hunters Point. The Absaroka was outbound to sea from the Oakland Estuary and was proceeding in a westerly direction off Yerba Buena Island. The two vessels collided, when it was dark but clear, near the span between D and E caissons of the San Francisco-Oakland Bay Bridge. The owner of each ship claims the other solely responsible.

Before the collision the Maui, her witnesses declared, was being steered by the green lights in the center of the span between D and E caissons of the Bay Bridge, holding those lights close on her port bow. She sighted ahead of her a tug, the Standard Oil Despatch No. 7, and its tow. She blew a two blast signal to the tug, showing an intention to pass the tug on its port side, and altered her course slightly to port. Thereafter, the Maui and the tug and tow were on parallel courses, with the latter to the right of the former. A two blast signal from the tug, coming a minute or more later, was assumed by the Maui to be in reply to her signal. In fact, the tug's signal was intended as an invitation to the Absaroka for a starboard to starboard passage and was answered by two blasts from the Absaroka.

Shortly after exchanging signals with the tug, the Maui and the Absaroka sighted each other when the two vessels were over a mile and more than five minutes apart. The Maui was starboard of the Absaroka, and the projected course lines of the two vessels crossed. Therefore, as is admitted by all involved, under the rules of the road the Absaroka was the burdened vessel with the duty of keeping clear of the Maui, and the Maui was the privileged vessel with the duty of holding her course and speed.[1] The Maui was proceeding at twelve knots an hour, half speed, and the Absaroka at approximately nine knots, full speed. A one-blast signal by the Maui was immediately answered by one blast from the Absaroka. (There is some confusion as to the blasts exchanged but no indication that either vessel varied from the agreement reached by the one-blast signals.)

After the exchange of signals the Maui maintained her course and speed for several minutes in accordance with her duty under Article 21 of the Inland Rules, 33 U.S.C.A. § 206.[2] For a period of three and a half minutes the officers on the Maui observed no attempt on the part of the Absaroka to change course or speed in order to pass under the stern of the Maui according to the rules of the road and to their exchange of signals. About two or two and a half minutes before the impact, when a collision seemed imminent to him, the Maui's captain ordered certain maneuvers of his ship in the hope of avoiding the collision; at the same time the danger signal of four short blasts was blown followed by one blast. The maneuvers were begun just as the Maui was passing the tug or shortly thereafter. The tug altered its course to the right away from the scene of danger.

The Absaroka still had headway at the time of the impact. According to the Maui's witnesses she maintained her speed of full ahead, nine knots, until a minute and a half before the collision. She struck the forward port side of the Maui at an angle from ahead of about 70° or 80°.

According to the Absaroka's version of the facts she was approaching the D-E span of the Bay Bridge from the east keeping the green lights in the center of the span a little open on her port bow. She exchanged two-blast signals with the tug Despatch No. 7, thereby agreeing on a starboard to starboard passage. Thereafter and about three minutes before the collision, the Absaroka sighted the Maui, and one blast signals were exchanged. The Maui appeared to be on a course crossing that of the tug. Within a minute or two after the one blast signals the Absaroka stopped her engines. Soon, the Maui altered her course to the left and blew the danger signal of four blasts. About a half minute before the collision the Absaroka went full astern on her engines and hard right on her rudder; she also blew the danger signal to the Despatch No. 7. The appellee's brief explains: "As the vessels approached more

---

[1] Article 19 of the Inland Rules, 33 U.S.C.A. § 204: "When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

Article 22 of the Inland Rules, 33 U.S.C.A. § 207: "Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

Article 23 of the Inland Rules, 33 U.S.C.A. § 208: "Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

Pilot Rule VII, 33 Code of Federal Regulations § 312.7: "When two steam vessels are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steam vessel is overtaking another, the steam vessel which has the other on

her own port side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse.

"If from any causes the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood."

The meaning of the rule is further clarified in § 312.13, "Fifth Situation."

[2] Article 21 of the Inland Rules, 33 U.S.C.A. § 206: "Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed."

closely the Maui appeared to be caught in a tideway in such manner that her port side was swept down on the stem of the Absaroka." The Absaroka's captain admitted that at the time of the collision his ship had some headway while the Maui had none but insisted the Maui "swept down in a sidewise motion * * *. She swooped on the Absaroka at a right angle."

The Absaroka contends that the collision took place near pier E of the Bay Bridge, that is, the pier to the Maui's left as she headed south. The Maui declares that the collision occurred almost under the green lights in the center of the D-E span, the Maui having passed only partly under the bridge.

The district court after making findings of fact concluded that the Maui was at fault for excessive speed in the circumstances, for crossing ahead of the tug in violation of her duty as burdened vessel under Article 19, Inland Rules, 33 U.S.C.A. § 204, or for passing the tug without the assurance that an understanding had been reached in violation of Article 18, Rule VIII, 33 U.S.C.A. § 203,[3] for altering her course to the left in violation of Article 21, Inland Rules, 33 U.S.C.A. § 206, and of her passing agreement with the Absaroka, and for failing to keep to the right with respect to the passage between piers D and E in violation of Article 25, Inland Rules, 33 U.S.C.A. § 210.[4]

■ The rule in admiralty cases is that, although an appeal opens the case for a trial de novo, findings of fact are entitled to great weight but such rule is modified where the findings are based wholly upon depositions. The Natal, 9 Cir., 1926, 14 F.2d 382, 384; Alioto v. Imahashi, 9 Cir., 1940, 115 F.2d 324, 325. In cases in which witnesses testify in open court and depositions also are introduced, the rule is subject to modification in the sound judgment of the appellate court. See Yamashita Kisen K. K. v. McCormick Inter. S. S. Co., 9 Cir., 1927, 20 F.2d 25; The Ernest H. Meyer, 9 Cir., 1936, 84 F.2d 496, 501. In the instant case one witness appeared at the trial and twelve witnesses testified by deposition. The testimony of two witnesses, taken before a "C" Marine Inspection Board a few days after the collision, was introduced into evidence pursuant to stipulation.

We have weighed the evidence with the rule in mind, allowing due weight, as we see it, to the District Court's advantage in having an important eyewitness before it.

■ When the Maui and the Absaroka sighted each other, they were on crossing courses. Risk of collision, that is the possibility of collision, was involved as is evident from the actual occurrence of a collision. The Carroll, 1868, 8 Wall. 302, 75 U.S. 302, 305, 19 L.Ed. 392.[5] Under the Inland and Pilot Rules the Maui, being on the starboard side of the Absaroka, was the privileged vessel, with the duty of maintaining her course and speed while the Absaroka was the burdened vessel with the duty of keeping out of the way.

The facts show that the vessels sighted

---

[3] Article 18, Rule VIII of the Inland Rules, 33 U.S.C.A. § 203: "When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall direct her course to starboard; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall direct her course to port; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals. The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel."

[4] Article 25 of the Inland Rules, 33 U.S.C.A. § 210: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

[5] The trial court's finding VI states that, at the time the vessels first saw each other, they were on crossing courses. According to finding IX a maneuver of the Maui created a risk of collision one-half minute before the collision. Insofar as this latter finding is inconsistent with our view that risk of collision within the meaning of Pilot Rule VII existed when the vessels first sighted each other, the trial court erred.

each other approximately five minutes before the collision. At that time they were more than a mile apart. There was, then, ample opportunity for the taking of any steps necessary to effect a safe passage. They exchanged one blast signals thereby entering into a passing agreement in accordance with the rules, an agreement that the Maui would cross the bow of the Absaroka and that the Absaroka would cross the stern of the Maui.

In the face of her duty under the Inland and Pilot Rules and of her whistle agreement the Absaroka maintained her speed at full ahead, nine knots, until at least two minutes before the collision, when her engines were stopped. She maintained her course until approximately a half minute before the collision, when the wheel was put hard right and the engines reversed. She still had headway at the time of the impact. The rules direct that a burdened vessel keep out of the way by directing her course to starboard so as to cross the stern of the other vessel or by slackening her speed, stopping, or reversing. The Absaroka ignored their commands until too late to avoid disaster. She disregarded her duty as the burdened vessel and thereby violated Articles 19, 22, and 23 of the Inland Rules and Pilot Rule VII.

■ As a burdened vessel violating an applicable statutory rule, the Absaroka is prima facie at fault and to relieve herself of liability has the burden of proving that the collision could not have been caused by her fault. The Pennsylvania, 1873, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148; The Carroll, supra; The Wolsum, 5 Cir., 1926, 14 F.2d 371, 376.

■ The position of the Absaroka is that the Maui altered her course to the left about two minutes before the collision and therefore failed to maintain her course and speed as required by Article 21 of the Inland Rules and by Pilot Rule VII. The district court found such an alteration in course, but we think the finding not supported by the great weight of the evidence adduced herein.

For about three minutes after sighting the Absaroka the Maui maintained her course and speed. Then the captain, believing a collision imminent, ordered full speed ahead on both engines. Less than a minute later, he ordered full astern on the starboard engine [6] and hard right rudder in an attempt to turn the ship to the right. Still later, and in an effort to swing the Maui's stern away from the bow of the Absaroka, the captain ordered full astern on the port engine, full ahead on the starboard engine, and hard left rudder. However, the impact occurred too soon thereafter for the last commands to be effective.

The keeper of Yerba Buena lighthouse in his testimony placed the collision next to caisson E of the Bay Bridge (the caisson to the Maui's left), which position would mean a previous turn to the left by the Maui, but he also testified that he saw no change in the course of the Maui from the time he first sighted her about a minute before the collision until the time of the collision. Captain Prendle of the Absaroka declared that the Maui swung a little to the left when he first sighted her but immediately swung back to the right again. Testimony of the Maui's officers showed no alteration of the Maui's course to the left after the Absaroka was sighted. Also all the testimony, except that of the lighthouse keeper, indicates as the place of collision a position just south of the Bay Bridge and halfway between D and E caissons, rather than a point to the left of the halfway mark and close to E caisson. We find nothing in the evidence persuasively indicating a change in course to the left by the Maui shortly before the impact. As to the place of the collision, we think the evidence fixes it near the center of the D-E span.

To illustrate the Absaroka's freedom from any fault, appellee develops a precise, mathematical argument based on a note to Article 17 of the Inland Rules, 33 U.S.C.A. § 201, to the effect that: "Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist." It then details testimony elicited herein as to bearings of the Maui and Absaroka as they approached each other. From such testimony it evolves scaled drawings showing the relationship of the ships to each other prior to the collision. The diagrams show

---

[6] The Maui's deck bell book showed "P" for port engine, rather than "S" for starboard engine, but the captain's testimony and the engine room bell book leave no doubt that astern on the starboard engine was the order given and carried out.

that the collision could not have occurred had both vessels maintained course and speed, for the point of intersection of their courses would have been passed safely by the Maui before being reached by the Absaroka.

The figures used by appellee were estimates made by witnesses some time after the collision. Great differences in result flow from slight variations in the figures used. We think in the very nature of things little if any help in the solution of the issues in this case can be obtained from the use of such mathematical formulae.

■ The last minute maneuvers of the Maui were perhaps not wise in the circumstances according to subsequent and carefully studied calculations. Admittedly, the Maui deviated from her privileged vessel duty of maintaining course and speed. However, the Absaroka being clearly at fault, any error on the part of the Maui was committed in extremis, that is in the face of imminent collision, and was not chargeable as a fault. The Gulf Star, 3 Cir., 1943, 136 F.2d 461, 464–5; The Arkansan, 9 Cir., 1940, 112 F.2d 230, 231; The Nordpol, 2 Cir., 1936, 84 F.2d 3, 5; Pacific-Atlantic S. S. Co. v. United States, 9 Cir., 1933, 63 F.2d 414, 416. We do not think the Maui's maneuvers contributed to the collision.

According to a contention of appellee, since the Maui was the burdened vessel as to the tug Despatch, the Absaroka had a right to assume that the Maui would perform her duty and keep out of the way of the Despatch, and the Maui was at fault for ignoring that duty. Two cases, Clyde-Mallory Lines v. New York Cent. R. Co., 2 Cir., 1936, 83 F.2d 158 and The Hoboken, 2 Cir., 1932, 59 F.2d 993, are cited in support of the argument. The reasoning in the cited cases is not applicable herein, for the facts are not closely analogous. In the cited cases whistle signals were not exchanged by the colliding vessels after all factors were known to both, and therefore the vessels never agreed on a method of passing.

■ In the instant case both the Maui and the Absaroka were aware of the presence of the Despatch and of all other circumstances influencing their relation to each other when they exchanged one-blast signals. Thereafter, it is difficult to see how the Absaroka could reasonably think the Maui would hold back for the Despatch; such action on the part of the Maui would have been in violation of her agreement with the Absaroka. The tug, in our opinion, is not a factor to be considered in fixing fault as between the Maui and the Absaroka. We think it unnecessary to determine whether or not the Maui violated a rule of the road with respect to the tug, for any such violation could have no logical connection with the fault causing the collision. The district court erred in determining the Maui at fault because of the manner in which she passed the Despatch.

■ The district court also erred in determining the Maui at fault on the ground of excessive speed in the circumstances. The only speed limit applicable to vessels on San Francisco Bay is that of Article 16, Inland Rules, 33 U.S.C.A. § 192, which requires "a moderate speed" in "fog, mist, falling snow, or heavy rain storms." It is unquestioned that the atmosphere was clear although dark and that the visibility was unlimited at the time of the collision under consideration. Therefore, no statutory speed limit controlled the Maui's progress. The Maui was the privileged vessel required to hold her course and speed under Article 21 of the Inland Rules, 33 U.S.C.A. § 206. When she and the Absaroka sighted each other, there was sufficient time for the latter to keep clear as her burdened vessel status under Article 19 of the Inland Rules, 33 U.S.C.A. § 204, demanded. The exchange of one blast signals indicated the Absaroka's recognition of her duty and her intention to pass under the stern of the Maui. The Maui could not assume that the Absaroka would fail in her duty and in her whistled agreement to keep clear. Furthermore, we cannot say the Maui's speed was reckless, for the collision would have been prevented by a speed faster than her twelve knots as well as by a slower rate. There were no "special circumstances" herein, within the meaning of Article 29 of the Inland Rules, 33 U.S.C.A. § 221, which would necessitate the Maui's varying her course or speed. On the contrary, she was properly obeying the rule applicable to her. See The Fred B. Dalzell, Jr., 2 Cir., 1930, 45 F.2d 580; The Chicago, 2 Cir., 1903, 125 F. 712.

■ It is argued, and the district court concluded, that the Maui violated the narrow channel rule, Article 25 of the Inland Rules, 33 U.S.C.A. § 210, by failing to pass under the right half of the Bay Bridge D-E span. Without regard to the applicability

of the narrow channel rule herein, we think the conclusion in error for the reason that under our view of the facts the Maui consistently kept to the right.

Since the Absaroka was flagrantly at fault and in our opinion the Maui was not at fault, the damages should not be apportioned. The Victory, 1897, 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519; The Cranford, 2 Cir., 1928, 27 F.2d 710, 712; The Lexington, 2 Cir., 1921, 275 F. 279, 284; The Binghampton, 2 Cir., 1921, 271 F. 69, 72.

The decree is reversed, and the cause remanded with instructions to enter a decree in conformity with this opinion.