ZIM ISRAEL NAVIGATION CO., Ltd.,
Libelant,

v.

STEAMSHIP AMERICAN PRESS and
United States Lines Company,
Respondent-claimant.

UNITED STATES LINES COMPANY,
Libelant,

v.

STEAMSHIP ISRAEL and Zim Israel
Navigation Co., Ltd., Respondent-
claimant.

United States District Court
S. D. New York.

Aug. 2, 1963.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for Zim Israel Navigation Co., Ltd.; Eugene F. Gilligan, David C. Wood, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for United States Lines Co.; John F. Gerity, Richard H. Brown, Jr., New York City, of counsel.

WEINFELD, District Judge.

These are consolidated suits arising out of a collision between the passenger vessel, the S.S. Israel, owned by libelant, Zim Israel Navigation Co., Ltd., and the S.S. American Press, a freighter owned by the respondent, United States Lines Company. The collision occurred in the Main Ship Channel off the northwesterly corner of Governors Island, New York Harbor, on October 29, 1959, a clear, calm night with excellent visibility. The navigational lights of both ships were burning brightly; the Israel, white hulled, was especially well illuminated with her funnels flood lit.

The Israel, outbound, was proceeding on a generally westerly course between the Battery off lower Manhattan and Governors Island. The American Press, upbound in the Main Ship Channel, which lies west of Governors Island, was proceeding on a generally northerly course, her destination being Pier 61, North River.

The Israel is a single screw ship; her length is 501 feet and her beam sixty-five feet; she was loaded to a draft of twenty-four feet, six inches forward and twenty-seven feet, two inches aft. The American Press also has one propeller; she is 460 feet in length and sixty-three feet in beam and was loaded to a draft

of twenty-one feet, ten inches forward and twenty-five feet, eight inches aft.

The Israel's navigation was in charge of Sandy Hook pilot Daniel v. Jones. The American Press was in charge of pilot Arthur R. Biagi. Each pilot, according to his version, substantially supported by the respective ship's officers and crew members who were on the bridge immediately before and at the time of collision, contends he fully adhered to the Rules of the Road, exercised due care, and was free from fault—and if so, then this is "another case in which the collision in theory should not have occurred."[1] There is the not unusual conflict in testimony of officers and crews of the two ships as to speed, relative distances, signals and point of collision.[2] Testimony was received from thirty-five witnesses, fourteen of whom, including the pilots of both vessels, were examined and cross-examined at the trial; the depositions of the others were read in evidence. On some major matters the versions of the witnesses called by each side are irreconcilable, and even among the witnesses offered by one side there are inconsistencies, all of which may prove the frailty of the human mind or the lack of adequate recollection of past events with the likely result of crew members testifying favorably to their ship.[3] However, documentary evidence has put beyond challenge basic information as to certain significant matters.

There are, of course, three probabilities—that the Israel was entirely free from fault and the American Press was solely to blame, or that the American Press was entirely free from fault and the Israel was solely to blame, or that both were at fault. Each vessel charges the other was solely to blame and that she was free from any contributory fault.

Based upon a close study of the entire trial record and the depositions of the witnesses, analysis of the numerous exhibits, a review of my trial notes, and an appraisal of those witnesses who testified upon the trial, I have concluded that each vessel was guilty of statutory fault and failed to navigate with prudent seamanship.

One matter not in substantial dispute is that each vessel observed the other five minutes before the collision when they were about one to one and a half miles apart under circumstances more than sufficient to effect safe passage. The parties also agree that from the time the vessels were in sight of each other and throughout their approach they were on crossing courses; that under the Inland Rules,[4] the Israel was the privileged or holding-on vessel, with the duty of maintaining her course and speed, and the American Press the burdened or giving-way vessel, with the duty of keeping out of the way of the Israel.[5]

The Israel charges that the American Press, as the burdened vessel, failed to

1. California Transp. Corp. v. United States, 311 F.2d 655 (2d Cir. 1963).

2. Cf. The Edward P. Meseck, 35 F.2d 866 (2d Cir. 1929); Newtown Creek Towing Co. v. The Christine Moran, 115 F.Supp. 244 (S.D.N.Y.1953).

3. Cf. Grace Line, Inc. v. United States Lines Co., 193 F.Supp. 664, 671 (S.D. N.Y.1961), aff'd on opinion below, 302 F. 2d 933 (2d Cir. 1962).

4. Steering and Sailing Rules and Signals, 33 U.S.C. §§ 201–13 (1958).

5. *Steam vessels crossing* (art. 19).
When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other. 33 U.S.C. § 204 (1958).

*Vessel having right-of-way to keep course* (art. 21)
Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed. 33 U.S.C. § 206 (1958).
*Crossing ahead of vessel having right-of-way* (art. 22)
Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other. 33 U.S.C. § 207 (1958).
*Duty of steam vessel to slacken speed* (art. 23)
Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse. 33 U.S.C. § 208 (1958).

hold up her approach seasonably, crowded upon and overran the crossing course of the Israel, and failed to alter her course to starboard.[6] The American Press, on the other hand, charges that the Israel, as the privileged vessel, failed to keep her speed, but on the contrary unnecessarily reduced and abruptly varied her speed. The Israel replies that these maneuvers were compelled in order to avoid risk of imminent collision which was thrust upon her by the wrongful conduct of the American Press.[7]

The Israel, in charge of pilot Jones, left her Kent Street pier in the East River assisted by the tug Grace McAllister, and headed down the East River at about 7:56 P.M. Also on the bridge to assist in her navigation were the Israel's master, chief officer and watch third officer and wheelsman; in the forecastle were a senior officer, several seamen and a boatswain.

The Israel proceeded down the East River at various reduced speeds, arriving in the vicinity of Pier 6, East River, at about 8:15 P.M., where the tug was dismissed. As the Israel approached the East River deepwater range,[8] the exit channel, she made a gradual swing to the right and steadied on a heading of 267 degrees true in the green sector of the range at 8:21½.[9] The tidal current was ebbing in a general southwesterly direction at the rate of about 1.3 knots. When the Israel steadied on the range, her engines were put on slow ahead; her course was westerly, as aforesaid, off the Manhattan ferry slips heading for the Main Ship Channel. Within seconds the Israel

sighted the American Press about four points off her port bow, south of the lower or southern end of Governors Island, proceeding upstream in the Main Channel on a general northerly heading, and showing white range lights and soon her green side light. Pilot Jones, as well as others on the Israel, estimate that the American Press was then about a mile to a mile and a half away. At about the same time, pilot Biagi and others on the bridge of the American Press sighted the Israel off the Manhattan slips, off the starboard bow of the American Press. They also fix the distance that separated the two vessels as a mile to a mile and a half. Thus, up to the point of the vessels sighting one another, there appears to be no substantial dispute, but here their stories diverge.

When the vessels first sighted each other, the navigators knew that they were on crossing courses. In fact, each pilot testified that he sought confirmation of the crossing situation by sounding a one-blast whistle to which a reply was expected from the other, but a sharp dispute exists as to the signals—who signalled first, when the signals were blown, and what was heard.

We first consider the version of the Israel. Pilot Jones testified that upon sighting the American Press, at about 8:21½ P.M., he sounded a short one-blast signal and, no response having been heard, he repeated the signal about ten or fifteen seconds later. When the Israel, then on slow ahead, failed to receive a response to the second one-blast signal, and it appearing to Jones that the Amer-

6. Pilot Rules for Inland Waters, § 80.7, 33 C.F.R. § 80.7 (1962). See Matson Nav. Co. v. Pope & Talbot, Inc., 149 F.2d 295 (9th Cir.), cert. denied, 326 U.S. 737 (1945).

7. See Postal S.S. Corp. v. El Isleo, 308 U.S. 378, 387 (1940); The New York, 175 U.S. 187, 205 (1899).

8. The range is a guide for deep draft vessels entering or leaving the East River and marks the deepwater channel between two shoals of water, one on the northeasterly corner of Governors Island, and the other on the south side of Man-

hattan. The range light is on the Brooklyn shore and delineates the deepwater channel. A green section indicates the northern segment of the channel, a white section the middle segment and a red section the southern segment. Shortly after the collision, these were changed to two sections, a fixed green and a fixed red light.

9. The times stated are those of the bridge times of the respective vessels. The Israel's time appears to be a half minute earlier than that of the American Press.

ican Press was continuing her headway at a steady speed, he ordered the telegraph on stop. This was at 8:22.[10] He still waited a "little while" for a response, which did not come, and then he sounded a danger signal of four or five blasts followed by another one-blast signal. He judged the vessels were then separated by about a half to six-tenths of a mile. He further testified that the bearing of the American Press did not change, which meant to him that each vessel was maintaining course and speed, and if this situation continued, there was danger of collision; accordingly, at 8:23 he ordered full speed astern and signalled this maneuver by three short blasts. Upon noticing a slight change in the American Press range lights which led him to believe she might be going to the right, at 8:23½ he ordered his engines stopped, but immediately the American Press showed a broader starboard light indicating she was going to her left with a collision imminent. He ordered emergency full speed astern and again signalled by three whistle blasts. The Israel's bridge book records this at 8:24, two minutes after the first stop order, and two minutes before the collision. Jones swore that it was only *after* the Israel had sounded her second three-blast signal when, for the first time, he heard any signal from the American Press—a three-blast whistle signalling that she too was going full speed astern. The vessels were then about two-tenths to three-tenths of a mile apart and the distance of each vessel to the point of intersection of their courses was somewhat less. Jones' estimate is the Israel's headway then was five or six knots.

The Israel's pilot also testified he heard the port anchor of the American Press leave the hawse pipe and hit water about eighty or 100 feet before the collision; that the American Press blew a series of short blasts until the collision at about 8:26 (Israel bridge time; 8:26½, American Press bridge time) with the stem of the American Press striking the Israel just abaft of the bridge at an angle of sixty to seventy degrees from the Israel's stem. The impact caused the Israel to roll slightly to starboard and she straightened up; the American Press lurched to port. The vessels were in contact less than fifteen seconds and separated as the American Press backed down. Jones' judgment was that at the point of impact the heading of the Israel through water was about one knot and that of the American Press about two and a half knots. The Israel was penetrated on her promenade deck and was substantially damaged, as was the American Press, but not as seriously. The underwater body of the Israel was also damaged and she took water in her engine room for several minutes after the collision and listed slightly to port. She proceeded to the anchorage off the Statue of Liberty, where she grounded and later was towed by tugs to a shipyard.

The testimony of the Israel's pilot in most respects is fully corroborated by her officers and crew members who were on the bridge, and additionally as to the signals by the two captains of the tug Grace McAllister which, after her dismissal, paralleled the Israel down the East River. The American Press pilot and ship's officers dispute that the Israel sounded the various signals as testified to by her pilot and others. In any event, they deny hearing such signals except for one three-blast signal which they assert was sounded by the Israel only *after* the American Press' three-blast signal. Also, two crew members of the American Press acknowledge that they heard a "sputtering" or "spitting" sound, but were uncertain it came from the Israel.

We now consider the version of the American Press. The American Press, in charge of pilot Biagi, left Pier 4, Army Terminal, Brooklyn, at about 7:45 P.M. bound for Pier 61, North River. He was assisted on the bridge by the master, watch officer, night relief mate, and a seaman at the wheel; a seaman

---

10. The bridge time of the Israel appears to be 1½ minutes ahead of its engine room time as reflected by the bridge bell book and engine room bell book.

lookout and the carpenter were on the bow.

The American Press proceeded across the anchorage below her berth, turned up the Main Ship Channel northbound at buoy 24. The ship was then put at full ahead, harbor maneuvering speed of about eleven knots through the water, and passed buoys 26, 28 and 30 on her starboard. The pilot, who was steering by landmarks and the buoys, judged that the American Press passed 500 feet off buoy 30, on a heading of approximately twenty-nine degrees; however, the wheelsman and master, who observed the ship's compass, testified she was steering twenty-four degrees.

As already noted, at about 8:21, pilot Biagi and others on the bridge and bow of the American Press, after she passed the Statue of Liberty abeam to port, sighted the Israel outbound on the East River deepwater range. There are variations among some as to the location of each vessel upon sighting the other. Pilot Biagi testified that the American Press was just south of and about two ships lengths, about 1000 feet, to the west of the Governors Island southwest fixed red light, and that the Israel, by direct line of sight coming out of the deepwater range, was well over a mile away, proceeding in a westerly direction two and a half points off his starboard bow, and that the Israel at her speed would easily and safely cross his bow. The pilot further testified that, aware a crossing situation existed, he reduced the speed of his ship, which was then proceeding at full maneuvering speed, to slow ahead. This direction was given at 8:22.[11] He claims that immediately he sounded a single short blast to advise the Israel that the American Press was going to pass under her stern, to which he expected a verifying answer. His testimony as to this is as sharply challenged by the Israel's complement as is the Israel's own claim that she gave the two single blasts

and other signals. In any event, Biagi did not receive the expected response. He then stopped the engines of the American Press at 8:23 and she started to lose some headway. The pilot was still of the opinion that the Israel could safely cross ahead; however her bearing remained constant, which indicated to him that she was slowing down; that thereupon at 8:24 he went half astern to give, as he testified, the Israel more room to cross ahead. He judged by direct line of sight that she was then one half mile distant. The American Press then started to back slowly to port with her heading to starboard. From the time Biagi first sighted the Israel until the American Press went half astern at 8:24, there was no change of course or heading on his vessel, nor did he observe any on the Israel. Accordingly, at 8:24½ he put the American Press engine on full astern and sounded three short whistles to signify the maneuver. The Israel's bearing then was two points on his bow.

Biagi also swore that the first responsive signal he heard from the Israel was a three-whistle blast immediately *after* he had given his three-whistle blast at 8:24½; that he then realized that the Israel was also going full astern and the danger of collision, whereupon he put his engine to emergency full astern and ordered standby anchors, and upon word that they were ready, the anchors were let go at 8:25½. He then blew the danger signals until the moment of contact at 8:26½ (American Press bridge time) and believed he also heard one blast from the Israel. He further testified that immediately before the collision the Israel's headway was two or three knots and the American Press was barely moving; that upon collision the bow of the American Press hooked into the Israel's port side upper structure, about 'midship, at an angle of seventy degrees; that the Israel went across the American Press' bow, down her port side, turning to the left, and his vessel heeled over to port and

---

11. The bridge time of the American Press appears to be one minute faster than engine room time.

her bow swung around from right to left with the Israel; that the vessels were in contact less than fifteen seconds when the engines stopped after the American Press backed clear. The testimony of the American Press pilot, as in the instance of the Israel's pilot, finds a large measure of support in the testimony of those on the bridge and other crew members, although there are discrepancies and contradictions as to a number of items.

Thus the pilots agree that at almost the identical time, two minutes before the collision, they put their engines on emergency full astern; however, they disagree as to which one first signalled that action. Among other matters, they also differ as to the headway of each vessel immediately before the collision, taking almost opposite positions.

The site of collision, whether to the eastward or westward of the midline of the navigation channel, is another matter of sharp controversy. All witnesses are in accord that it was westerly of the two fixed red lights on the northwest corner of Governors Island, but the exact location is as varied as the number of witnesses who testified. Biagi, the American Press pilot, swore that at the time of collision, his ship was on the easterly side of the mid-channel, the same side as which he had navigated her up the channel. The respondent places the collision a third of a mile in the general northwesterly direction from the northwesterly corner of Governors Island. On the other hand, Jones, the Israel's pilot, swore it occurred west of the center line of the main channel, although he also fixed other locations. Generally, the libelant contends that it was west of the mid-channel about 900 yards off the northwest corner of Governors Island. And thus the contested and other fact issues are to be considered with reference to the applicable law.

■■ With the crossing situation acknowledged, under Articles 19 and 21 of the Inland Rules [12] it was the duty of the Israel to keep her course and speed and the duty of the American Press to keep out of the way. While the Inland Rules themselves do not mandate how the burdened vessel is to keep out of the way of the privileged vessel,[13] definition of the duty is specified in the Pilot Rules for Inland Waters, promulgated by the Commandant of the Coast Guard pursuant to statutory authority.[14] Pilot Rule 80.7 (a) [15] provides that the burdened vessel "shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse." This regulation has the force of law except to the extent that it may be in conflict with the statutory rules.[16] And the Supreme Court has recognized the substance of this regulation to require the burdened vessel to keep clear by porting her helm (altering to starboard) [17] and going as-

12. 33 U.S.C. §§ 204, 206 (1958).

13. The George S. Shultz, 84 Fed. 508 (2d Cir. 1898).

14. 33 U.S.C. § 157 (1958); 23 Fed. Reg. 7592 (1958). See Note at 33 C.F.R. 205 (1962).

15. PILOT RULES FOR INLAND WATERS, § 80.7
   *Vessels approaching each other at right angles or obliquely.*
   (a) When two steam vessels are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steam vessel is overtaking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse. 33 C.F.R. § 80.7(a) (1962).

16. Belden v. Chase, 150 U.S. 674, 698 (1893).

17. "Porting" is the same order that means "Right Rudder" under the present Inland Rules, Article 32. See 33 U.S.C. § 232 (1958).

tern of the preferred vessel.[18] And our Court of Appeals has suggested that "this is the path of safety." [19]

■ Departure from the statutory duty imposed upon the vessels is justified only when necessary to avoid immediate danger,[20] and the burden of proof is upon the vessel which alleges justification for the departure.[21]

Upon this record there can be no doubt that the Israel, soon after she sighted the American Press at 8:21 and aware a crossing situation existed, did not continue her then speed of slow ahead; on the contrary, she varied and reduced her speed. According to her own version, her maneuvers were as follows: 8:22—stop; 8:23—full astern; 8:23½—stop; and at 8:24—emergency full astern until the collision at 8:26.

The Israel can exonerate herself from her failure to adhere to her statutory duty to keep her speed only upon a showing that her varied actions were compelled to avoid immediate danger of collision, which she asserts was the fact, created by the statutory fault of the American Press in not keeping clear of her, principally by not altering her course to starboard and not reducing headway seasonably and adequately. In sum, the Israel justifies her departure from the mandate of Article 21 of the Inland Rules by reliance upon the General Prudential Rule, Article 27, which provides:[22]

"In obeying and construing these rules due regard shall be had to all

dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

She also relies upon the adjudicated cases thereunder which hold:

"The so-called privileged vessel has no absolute right to keep her course and speed regardless of the danger involved in that action. Her right to maintain her privilege ends when there is danger of collision and in the presence of that danger both vessels must be 'stopped and backed' if necessary, until signals for passing with safety are made and understood.' " [23]

■ In considering whether there was such immediate danger as to warrant departure from duty, the assumption must be that the burdened vessel, just as the privileged vessel, will observe the Rules of the Road. Accordingly, the Israel was required to hold her speed as long as it was possible for the American Press to avoid her by starboarding or by other appropriate action, absent some definite indication that the American Press was about to fail in her duty [24]—that she "would not, or could not, perform her duty to keep out of the way." [25] An essential purpose of the requirement of strict adherence to the Rule is to assure certainty of navigation by each vessel

18. The New York, 175 U.S. 187, 202–203 (1899). See The Columbia, 77 U.S. (10 Wall.) 246 (1869). See also, The Delaware, 161 U.S. 459 (1896); Northern Petroleum Tank S.S. Co. v. City of New York, 282 F.2d 120 (2d Cir. 1960).

19. The George S. Shultz, 84 Fed. 508, 510 (2d Cir. 1898).

20. See The Boston, 277 Fed. 36 (2d Cir. 1921), cert. denied, 258 U.S. 622 (1922); The Binghamton, 271 Fed. 69 (2d Cir.), cert. denied, 255 U.S. 575 (1921).

21. Belden v. Chase, 150 U.S. 674, 699 (1893).

22. 33 U.S.C. § 212 (1958).

23. Postal S.S. Corp. v. El Isleo, 308 U.S. 378, 387 (1940).

24. See Wilson v. Pacific Mail S.S. Co., 276 U.S. 454 (1928); The Delaware, 161 U.S. 459 (1896); The Britannia, 153 U.S. 130 (1894); The Northfield, 154 U.S. 629 (1878); The Haida, 191 Fed. 623 (S.D. N.Y. 1911), aff'd on opinion below, 196 Fed. 1005 (2d Cir. 1912).

25. Connolly v. The Ace, 164 F.2d 86, 87 (2d Cir. 1947).

in accordance with the rules, thereby diminishing the risk of collision.[26]

We start with what hardly can be questioned—that had each vessel complied with her respective duty when she sighted the other a mile to a mile and a half apart about five minutes before the collision, there would have been no mishap. The fault charged by each against the other centers in large measure upon the respective maneuvers and actions which followed in the wake of the one-blast signals claimed to have been given by one to the other almost immediately after sighting one another.

The Crossing Rules and Regulations contain no provision for the giving and accepting of signals, since they clearly define the duty of each vessel.[27] The Israel, as the privileged vessel, was under no duty to give a passing signal, and the American Press was not entitled to receive any signal, since the Israel was in plain sight.[28] Whether the one-blast signals were given or not (even though not required), each vessel denies she heard the other's alleged blast. In any event, each asserts that the purpose of the one-blast signal was to obtain acknowledgment from the other of adherence to the Crossing Rules. The Court finds that each vessel gave the one-blast signal as testified to by its pilot; also, that these were not heard by the other vessel, although it is difficult to understand that failure since conditions for their reception were favorable and the whistles on the respective vessels were in good order and functioning. Since each pilot did not hear the other's single blast signal, he cannot claim he was misled by a signal which did not come to his notice. On the other hand, the pilot who

gave the one blast (referred to by the proctors as a "permissive" signal), not having received a response, cannot claim he was misled by an agreement of whistles.

While the purposes each may have had in mind in giving the signal are not altogether clear, the meaning of their respective blasts is clear. Pilot Rule 80.03(a)(3) reads as follows:[29]

> "One short blast of the whistle signifies intention to direct course to own starboard, except when two steam vessels are approaching each other at right angles or obliquely, when it signifies intention of steam vessel which is to starboard of the other to hold course and speed."

Pilot Jones testified he gave his one-blast whistle to the American Press to signify his intention that he wanted to pass ahead of her on his port side and that he was going to cross her bow by holding his course and speed; further, he added that although he knew he was the holding-on ship and that it was his right to cross ahead and his duty to keep his course and speed, a custom exists to exchange whistles to confirm a crossing situation. He also stated that another purpose was, as a matter of precaution, to get an agreement with the American Press, since at the juncture of the North and East Rivers there was a possibility that the Israel, with respect to other vessels coming down from the North River, might become a burdened vessel, and, further, he could not determine whether the American Press intended to head for the North River or the East River. At the Coast Guard hearing his explanation differed somewhat. There he testified that he stopped his engines "with the

26. The Delaware, 161 U.S. 459, 469 (1896); Northern Petroleum Tank S.S. Co. v. City of New York, 282 F.2d 120, 122 (2d Cir. 1960); The Piankatank, 87 F.2d 806, 810 (4th Cir. 1937).

27. Compania de Navegacion Cebaco v. The Steel Flyer, 200 F.2d 643, 645 (4th Cir. 1952).

28. Northern Petroleum Tank S.S. Co. v. City of New York, 282 F.2d 120 (2d Cir.

1960) (dictum); The Boston Socony, 63 F.2d 246 (2d Cir. 1933); The Hoboken, 59 F.2d 993, 995 (2d Cir. 1932); The Haida, 191 Fed. 623 (S.D.N.Y. 1911), aff'd on opinion below, 196 Fed. 1005 (2d Cir. 1912).

29. 33 C.F.R. § 80.03(a)(3) (1962).

thought that I, being the privileged vessel, I may want to navigate across his bow if he so answered me and gave me the right."

Whatever his subjective purpose in giving the separate two one-blast signals, each announced under Pilot Rule 80.03 the Israel's intention to hold course and speed, her duty as the holding-on vessel. Despite her announced declaration and statutory duty, she did not keep her speed. The assigned reason is the lack of anticipated reply by the American Press to the one-blast signals. But the American Press' failure to respond did not justify the Israel's departure from her definite and precise duty. When, at 8:22, four minutes before the collision, the Israel changed from slow ahead to stop, there was no circumstance of immediate or sudden danger. There was no traffic ahead, behind or off her port or starboard bows to cause the pilot any concern. Her immediate navigation problem was the American Press, which then was distant about a mile. Up to the emergency full astern order at 8:24, pilot Jones was of the opinion that the Israel could safely cross the bow of the American Press. At 8:22 there was no reason to believe that the American Press would disregard her duty to keep out of the Israel's way so as to warrant a change in her speed.[30] Indeed, unless it appeared that the American Press would not or could not perform her duty, it was to be assumed that each navigator would measure up to the Rules of the Road. Yet, commencing at 8:22, with the shift from slow ahead to stop, until 8:24, the Israel engaged in a series of maneuvers, all of which were contrary to her precise and definite duty to keep her speed. The one-blast signals, which led to these actions up to the emergency full astern, not only failed to secure the acknowledgment which the Israel sought, but served to divert her from her duty. The time had not then come for her to change her

speed upon any basis of sudden emergency or immediate danger. The conclusion is compelled that the Israel breached Article 21 when, between 8:22 and 8:24, she stopped her engine, reversed her engine, stopped her engine again, and then again reversed her engine; that she has failed to establish that her departure under the aforesaid Article was excusable or otherwise justified under the General Prudential Rule, Article 27.

There remains, however, the question as to whether the American Press also was at fault. Biagi's explanation of his purpose in sounding the one-blast signal upon sighting the Israel also runs in several directions. He testified that after watching the Israel for several seconds he knew that at her speed she would safely cross his bow. He put his vessel on slow ahead at 8:22 (four and a half minutes before the collision) and then gave the one-blast signal which the Israel did not hear. One avowed purpose was to convey to the Israel that he was going to pass under her stern. While he acknowledged understanding of the respective duties imposed upon each vessel in the crossing situation, he also stated that another purpose was to get a declaration from the Israel that she would maintain course and speed—that without it he had no way of knowing what she would do. And in this instance, too, whatever Biagi's subjective reason may have been for sounding the signal, Pilot Rule 80.03(a) (3) declares that it signified "intention to direct course to own starboard." It is not open to challenge that the American Press did not take the indicated action.

The American Press contends that although she did not carry out her announced intention, she met her duty by other maneuvers, but that their effect was neutralized by corresponding action of the Israel when the latter, at 8:22 and thereafter, varied and reduced her speed.

30. See Northern Petroleum Tank S.S. Co.
  v City of New York, 282 F.2d 120, 122
(2d Cir. 1960); Connolly v. The Ace, 164
F.2d 86, 87 (2d Cir. 1947).

The American Press engine orders and those of the Israel (adjusted to American Press bridge time by adding one-half minute) were as follows:

| AMERICAN PRESS | ISRAEL |
|---|---|
| 8:22 – slow ahead | 8:22 – slow ahead |
|  | 8:22½ – stop |
| 8:23 – stop |  |
|  | 8:23½ – full astern |
| 8:24 – half astern | 8:24 – stop |
| 8:24½ – full astern followed by emergency full astern | followed by 8:24½ – full astern emergency full astern |
| 8:25½ – port anchor let go |  |
| 8:26½ – collision | 8:26½ – collision |
| 8:26¾ – stop |  |

———◆———

The risk of collision existed shortly after the vessels sighted one another at about 8:21. While this did not then necessarily mean actual danger or certainty of collision, the crossing situation did require that as a matter of prudence the pilots were to "watch each other's navigation, and be prepared to do whatever safety may demand."[31]

In the three-minute interval from sighting the Israel at 8:21 to 8:24, when half astern was ordered, the American Press continued, without a change of heading, at her full speed of eleven knots for the first minute or so, and when she was put half astern at 8:24 she was making about eight knots. In the intervening time Biagi knew that the Israel had changed her speed. Under all the circumstances, aware of the Israel's offsetting conduct, the decelerating actions taken by her were not timely, sufficient or effective without alteration of course. They were too little and too late.

The pilot concedes he recognized the danger of collision at 8:24½, when he ordered the engines full astern and gave his backing signal. This was at the very time,[32] two minutes before collision, when the Israel did likewise because, as her pilot also says, he recognized the danger of collision and for the same reason. But by that time the vessels were in dangerously close quarters. While the estimates vary, the situation considering the size of the vessels, was perilous. The master of the American Press judged they were about 1900 feet apart and the distance to the collision much less; her watch officer thought they were separated by two to three ships lengths (1000–1500 feet); the lookout testified they were apart only a little more than one length, and one of the captains of the tug Grace McAllister estimated they were only 1000 feet apart.

Adequate safeguards against danger must be seasonably applied, and here they were not brought into play until danger was imminent and the ships were headed into the jaws of collision. When Biagi sounded his one-blast signal five minutes before the collision, the vessels were

**31.** Socony Vacuum Transp. Co. v. Gypsum Packet Co., 153 F.2d 773, 776 (2d Cir. 1946) (L. Hand, J.). See Ocean Marine Ltd. v. United States Lines Co., 300 F. 2d 496, 499 (2d Cir. 1962).

**32.** Making allowance for the time differential. See fn. 9.

about one mile apart; there was more than ample time and distance for him to have taken the necessary action to avoid danger of collision, which he and Jones only recognized when both ordered emergency full astern. Having observed the actions of the Israel, which he says offset his own, he.should have been aware of the danger of collision before 8:24½, when he put his vessel on full astern, and should have taken whatever appropriate action was required to avoid the collision.

The essential duty of the American Press as the burdened vessel was to keep out of the way of the Israel. However, in its discharge she was not restricted to slackening of speed, stopping or reversing—the maneuvers taken by her. Pilot Rule 80.7(a) [33] provides that the statutory duty shall be complied with "by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse."

The American Press must also be taxed for failure to alter her course to starboard. Although the pilot signalled this intention at 8:22, he never took such action.[34] It is evident that had the American Press turned to starboard at the time she gave the signal, or shortly thereafter, the collision would have been avoided, despite the Israel's change of speed.

The excuses for not carrying out the announced intention of changing heading to starboard are the Israel's failure to respond to the one-blast signal and the presence of a shoal area [35] to the right of the American Press off Governors Island which foreclosed such action. The explanation is wanting. The Israel's failure to respond neither negated nor diminished the duty of the American Press

"to keep out of the way." Moreover, Biagi was required to assume that the Israel would hold her course and speed, and the lack of verifying response did not permit a contrary assumption. Finally, when he gave the signal at about 8:22, he was aware of no action or conduct on the part of the Israel to indicate she did not or would not measure up to her duty.

As to the claim that the shoal area precluded starboard action, the evidence is persuasively to the contrary. Biagi must have deemed this action feasible, otherwise he would not have indicated it.[36] And this is confirmed by Vickers, the master of the American Press. Vickers understood the one-blast whistle to indicate the intention of the American Press to direct her course to starboard. He further testified: "We could have altered course [to starboard], but we hesitated because of no reply heard from the Israel." [37]

Biagi's trial testimony that he could not go to his starboard rested upon his judgment that the ship's course was twenty-nine degrees. However, he was navigating by landmarks. The wheelsman and master, who observed the ship's compass, testified that she was steering twenty-four degrees, and the evidence supports such a finding. Also, the wheelsman and the bow lookout gave testimony which would place the Israel further westward off Governors Island than the pilot testified. In any event, the acceptable evidence indicates and the Court finds that the American Press, at any time after sighting the Israel, was sufficiently to the west of Governors Island to have executed a starboard maneuver clear of the outermost point of the shoal.

Biagi's claim that there was danger to his vessel if he went to the right is put

33. 33 C.F.R. § 80.7(a) (1962).

34. See Matson Nav. Co. v. Pope & Talbot, Inc., 149 F.2d 295 (9th Cir. 1945); The Lisbonense, 53 Fed. 293, 300 (2d Cir. 1892), cert. denied 149 U.S. 786 (1893).

35. The shoal, less than thirty feet in depth, is off the sea wall on the west side of Governors Island and runs about one-third of a mile from the red light on the

southwest corner to about midway of the Island. It extends out about 300 yards westerly from the Island toward the navigation channel off the starboard of upbound vessels.

36. United States v. The J. A. Cobb, 283 F. 2d 754 (2d Cir. 1960).

37. Deposition of Vickers, Exhibit T, p. 106.

to serious challenge by his acknowledgment that one of the reasons he wanted a response from the Israel was that she might have departed from her duty and turned her course down the starboard side of the American Press. If he really believed there was enough room for the Israel to come between his starboard side and the Governors Island west wall and still clear the shoal, certainly there was more than enough room for the American Press to turn to the right in safety. In any event, if, in fact, starboard movement was restricted by the spur of the shoal, it emphasizes that the decelerating action taken by the American Press was entirely inadequate and untimely.

Biagi's unanswered signal led him into uncertainty and may account for his failure to act upon his declaration of intention to alter course to starboard. On the one·hand, he stated he wanted a response, since "without this declaration from [the Israel]. I have no way of knowing what he will do"; and on the other hand, when pressed as to why he failed to renew the signal, Biagi responded he felt the Israel most certainly had heard the blast. If he had that certainty, surely it emphasized the need to carry through on his announced intention to go to the starboard.

The one-blast whistle by each pilot, to which a reply was expected but never received, served only to confuse the pilot who gave it and resulted in imprudent seamanship. The unanswered signals led each pilot to depart from his known and specific duty under the Crossing Rules. Instead of certainty of action, they led to uncertainty of action. Unacknowledged permissive signals, or even so-called custom among pilots, may not overcome the strict requirements of the Crossing Rules, whose very purpose is to secure assurance of action.[38] Indeed, the proc-

tors for the respondent acknowledge that " * * * neither vessel should be entitled or required to govern its navigation on the basis that its own permissive signal has not been answered by the other." [39] This seems to be a case where the doubts engendered by the absence of a responding signal by the other produced that "timidity and feebleness of action" which resulted in, rather than prevented, collision.[40]

Upon the evidence the Court finds that the American Press failed in her statutory duty to keep out of the way of the Israel and that her fault also contributed to the collision. Accordingly, a decree may be entered finding both vessels at fault.

In view of the conclusion that each vessel committed a statutory breach and each has failed to meet her burden under the Pennsylvania Rule, [41] there is no need to discuss or determine other fact situations pressed by counsel in their very voluminous briefs, which no matter how resolved would not lead to a different conclusion as to legal liability.

The Court has fully considered all contentions presented by the parties. Each has advanced mathematical calculations to establish its freedom from fault and that the other party was solely to blame. The validity of their conclusions of necessity depends upon the accuracy of the testimony upon which the hypotheses rest. However, the basic testimony relied upon is so varied and at times contradictory as to preclude acceptance of the tendered conclusions.[42]

The foregoing ·shall constitute the Court's Findings of Fact and Conclusions of Law. Either party, upon notice to the other, may, within ten days from date, propose separately numbered and also additional findings not inconsistent with the foregoing.

38. See The George S. Shultz, 84 Fed. 508, 510 (2d Cir. 1898) ; The Haida, 191 Fed. 623 (S.D.N.Y. 1911), aff'd on opinion below, 196 Fed. 1005 (2d Cir. 1912).

39. Respondent's brief, p. 102.

40. Wilson v. Pacific Mail S.S. Co., 276 U.S. 454, 462–463 (1928).

41. The Pennsylvania, 86 U.S. (19 Wall.) 125 (1873).

42. Cf. Matson Nav. Co. v. Pope & Talbot, Inc., 149 F.2d 295 (9th Cir. 1945).